## **<u>EXHIBIT 1</u>**





**IN THE HIGH COURT
OF THE
REPUBLIC OF THE MARSHALL ISLANDS**

| | |
|---|---|
| AKHMEDOVA,<br><br>      Petitioner,<br><br>      vs.<br><br>AKHMEDOV, et al.,<br><br>      Respondents. | CIVIL ACTION NO. 2018-169<br><br><br>**ORDER FOR SUPPLEMENTAL<br>BRIEFING** |

TO:    James Power, counsel for petitioner Akhmedova
        James McCaffrey and Derek Adler, counsel for respondents Straight Establishment and
        Qubo 2 Establishment

      Having reviewed the *Petitioner's Motion and Memorandum of Law in Support of*

*Summary Judgement* filed November 27, 2018 ("Motion"), as well as the respondents' corrected

*Memorandum of Law in Opposition . . .* filed December 19, 2018 ("Opposition"), and the

petitioner's *Reply Memorandum . . .* filed December 24, 2018 ("Reply"), the Court orders as

follows:

      1.      On or before 4:30 p.m. on January 31, 2019, the parties must conclude all

discovery with respect to the Motion;

      2.      On or before 4:30 p.m. on February 13, 2019, the parties must file and serve a

supplemental memorandum, not to exceed 20 pages, with respect to the Motion;

      3.      On or before 4:30 p.m. on February 27, 2019, the parties must file and serve a

1

response to the opposing party's or parties' supplemental memorandum, not to exceed 20 pages; and

4.    The issues the supplemental briefing must address include the following:

a.    What law is applicable to the English Court's conclusion that the respondents Qubo 2 Establishment ("Qubo 2") and Straight Establishment ("Straight") are "alter egos" of dismissed respondent Farkhad Akhmedov and why?

b.    What facts do, or do not, support the English Court's conclusion that the respondents Qubo 2 and Straight are alter egos of Mr. Akhmedov?

c.    What are the legal consequences of the respondents being alter egos of Mr. Akhmedov?

d.    In particular, once the English Court determined that the respondents Qubo 2 and Straight were alter egos of Mr. Akhmedov, was the English Court's personal jurisdiction over Mr. Akhmedov imputed to the respondents, and why or why not?

e.    Did the respondents Qubo 2 and Straight receive constitutionally sufficient service of process?

Ordered and Entered: January 3, 2019.

Carl B. Ingram
Chief Justice, High Court

2

## EXHIBIT 2

Case 1:19-mc-00020-JPO   Document 3-1   Filed 01/16/19   Page 5 of 90

## The New York Times

# *A Russian Oligarch's $500 Million Yacht Is in the Middle of Britain's Costliest Divorce*

**By David Segal**

June 6, 2018

LONDON — With a spa, a swimming pool, two heliports and room for 18 guests, the Luna is more like a floating luxury villa than a yacht. A crew of 50 keep all nine decks in pristine shape. The lifeboats cost $4 million apiece. Gleaming engines propel the vessel at a maximum speed of 22 knots.

But for now, the Luna isn't moving. It sits in a dry dock in Dubai, the most fought-over prize in what has been called Britain's most expensive divorce.

In December 2016, a High Court judge ordered Farkhad Akhmedov, a Russian billionaire who has owned a home in England since the '90s, to pay the equivalent of $646 million to his ex-wife, Tatiana Akhmedova. He refused, arguing that the couple had been divorced in Russia more than a decade ago.

Unconvinced and unable to enforce his ruling, the judge in April ordered Mr. Akhmedov to hand over the yacht, valued at roughly $500 million, to his ex-wife. It has since been impounded by authorities in Dubai, where it had turned up for maintenance.

For more than a decade, Russian oligarchs have been parking their families and some chunk of their net worth in England. A deal was implied: The oligarchs got a haven from the pitiless realities of Putin-era Russia, and Britain got an influx of very rich people.

Now some oligarchs are learning that life here has hazards of its own. That goes even for nonresidents like Mr. Akhmedov, who never became a British citizen. Eager to keep British tax collectors away from his money, he limited the number of days he stayed in England to a maximum of 180 a year. (More recently, the number was reduced to 90 days.)

---

**You have 4 free articles remaining.**
**Subscribe to The Times**

---

In January, he appeared on the "Putin List," an inventory of business and political elites in Russia, published by the Trump administration. Seven oligarchs — though not Mr. Akhmedov — have since been subject to sanctions that prevent them from conducting business in the United States.

Even the Luna, the ultimate in high-end joy rides, is customized for a man anticipating trouble. It has a missile detection system, an anti-drone system, bulletproof windows and bombproof doors.

None of these features, however, have shielded Mr. Akhmedov from the British justice system, despite the exhaustive efforts of his legal and accounting team. Before arriving in the Middle East, the vessel had been on an epic journey, though one not measured in nautical miles.

As the nine-figure settlement was gaveled into divorce court history, Mr. Akhmedov began what the judge called a "campaign" to hide his assets "in a web of offshore companies." Nothing demonstrates the breadth and ingenuity of that web like the Luna. Starting in November 2016, the yacht went on a whirlwind voyage, all of it on paper, in a feat of asset protection and financial engineering so elaborate that the judge diagramed it in an April ruling.

Initially, the seizure of the yacht in Dubai sounded like a setback for Mr. Akhmedov. Then, he and lawyers for the family trust that technically owns the Luna filed a claim — still pending — arguing that the fate of the yacht should be decided by a local court in Dubai, using Islamic law, known as Shariah.

Legal experts say Mr. Akhmedov has calculated that his odds of prevailing are better in a Shariah court, especially given that his ex-wife is a Christian who has acknowledged infidelity in their marriage. Stories in British tabloids have lately emphasized that Mr. Akhmedov is a practicing Muslim.

That is news to Ms. Akhmedova. In her first-ever interview, which took place recently in the office of a public relations firm, she said she had never seen her ex-husband kneeling on a prayer rug or going to a mosque, other than at a tourist site.

"Apparently because he was born in Azerbaijan, he's a Muslim," she said, her eyes widening with disbelief. (A spokesman for Mr. Akhmedov disputed Ms. Akhmedova's characterization, saying that Mr. Akhmedov "has always been a devout and practicing Muslim.")

A sunny woman with a mild Russian accent, Ms. Akhmedova wore ripped denim jeans, a batch of string bracelets and a T-shirt that read "Free as a Butterfly." She said she was reluctant to speak publicly about her divorce, because everything about it is painful, including the recent media coverage in Britain, which has made much of allegations of infidelity leveled by both sides.

She's also startled by Mr. Akhmedov's campaign to keep her from pocketing one cent of his $1.4 billion fortune, most of which he earned selling his stake in a Siberian energy company called Northgas. Contrary to popular assumptions, she said, she needs the money. She is living off a lump sum provided to her by Burford Capital, a litigation finance firm, which is helping to fund the legal efforts and will take a percentage of any results.

"I don't want to play the victim, because it's not my nature," she said. "But I have to defend myself."

Ms. Akhmedova said she had always wanted to settle out of court, quietly and for far less than she was awarded. She still speaks fondly of the years she spent with her ex-husband, whom she says she met in Moscow in 1989, when she was 17. He was nearly twice her age.



The Luna, the ultimate in high-end joy rides, is customized for someone anticipating trouble. It has a missile detection system, an anti-drone system, bulletproof windows and bombproof doors.
Marco Secchi/Corbis, via Getty Images

"He was wearing a suit," she said. "He struck me as a very proper gentleman."

The two married in 1993 and moved to London. He started off in the fur business, selling sable skins on the London Commodity Exchange. He later pivoted to the natural gas sector and, in 2012, sold his 49 percent stake in Northgas for a reported $1.4 billion.

Over the years, he acquired a summer house in the south of France, two helicopters, vintage cars, fine art — by Rothko, Warhol and others — and a $26 million home in an upscale county outside London.

"We went from flying Aeroflot to British Airways to chartered flights," said Ms. Akhmedova. Later, they flew on their own $50 million private jet.

During the years that Mr. Akhmedov amassed his wealth, the couple regularly toggled between hostilities and opulent cease-fires. She said she filed for divorce a second time in 2013 — she had rescinded the first petition a decade earlier — when one of her ex-husband's paramours gave birth to a child.

They nonetheless tried another détente. That same year, Mr. Akhmedov bought more than $500,000 worth of jewelry for his wife, paid expenses for holidays and gave her access to his helicopters and credit cards, according to the judge overseeing the divorce. In 2014, Mr. Akhmedov acquired the Luna, which he purchased from Roman Abramovich, a friend and fellow oligarch. (Mr. Abramovich has had his own troubles with Britain recently, as the country has cracked down on a type of visa given to wealthy investors.)

"It would take four years to build a boat like that," said Ms. Akhmedova, who helped arrange the sale. "So we thought, why not ask our friend? He's got two boats, let's ask him for one."

Unfortunately, the change in behavior promised by her husband did not occur, she said. And once again, she pushed for divorce.

In 2003, Mr. Akhmedov had produced documents that purported to show that the couple had gotten a divorce from a Moscow court three years earlier. In his version of events, as explained by his spokesman, the marriage lasted a mere seven and a half years and was dissolved on the grounds of Ms. Akhmedova's adultery. The subsequent time together — from 2000 to 2014 — the gifts and vacations? That was for the sake of the couple's sons.

"To give them, as the children of divorced parents, the best possible experience of family life, my client also accompanied his ex-wife and children on occasional 'family' holidays," said the spokesman, Ian Monk, in an email.

This narrative portrays Ms. Akhmedova as an opportunist, who pounced when her ex-husband had his billion-dollar payday, in 2012.

"Within a few days of the wealth being realized by my client's sale of Northgas, Tatiana made her first approach for an English divorce," Mr. Monk wrote. "My client says that is a second divorce."

To underscore the point, Mr. Akhmedov refused to participate in the British divorce case, neither appearing in court nor sending a lawyer to the proceedings, which began in November 2015. He told the media that tensions between Britain and Russia would prevent him from getting a fair trial and that he regarded the case as political, part of Britain's efforts to seize assets from well-off Russians.

Judge Charles Haddon-Cave came to different conclusions. He ruled that the 2000 Russian divorce documents were "forged." Persuaded by Ms. Akhmedova's testimony, he concluded that the couple had "remained married in all senses of the word," until 2013.

Two days before the start of the trial, in November 2016, lawyers and accountants took the helm of the Luna and shuffled it to a handful of companies controlled by Mr. Akhmedov and his allies, in the Isle of Man, Panama and Liechtenstein. It eventually landed in a newly created family trust called Straight, which Judge Haddon-Cave wryly described in a ruling as "the antithesis of its name."

"In my judgment, it is clear that Straight is simply another 'cipher,'" he wrote, designed by Mr. Akhmedov "to evade enforcement."

A few months after the Luna arrived in Dubai for maintenance, the Dubai International Financial Center Courts — which conducts business in English and uses English common law — impounded the vessel.

Lawyers for Mr. Akhmedov and Straight have since filed an appeal with a Dubai entity called the Joint Judicial Tribunal, a seven-member committee created in 2016 and granted the power to decide which court has jurisdiction over a legal proceeding. Mr. Akhmedov contends that his dispute is a matrimonial one, which should be decided by a local Shariah court. He is not looking to relitigate the divorce, his spokesman said. He simply wants a judgment that says the British order to transfer ownership of the yacht cannot be enforced in Dubai.

Predicting how the tribunal will rule is not easy, in part because it has issued only a dozen or so decisions. What is clear is that if Ms. Akhmedova prevails, she will look for a buyer and sell the yacht. It is equally clear that Mr. Akhmedov will litigate this case until he wins or the vessel melts into decrepitude.

"He would rather see the Luna rot in the Dubai heat," said Mr. Monk, "than see it handed over to Tatiana."

**Editors' Note June 8, 2018:** *An earlier version of this articled failed to include a response to Ms. Akhmedova's comments about her ex-husband's Muslim faith. The article has been updated to include a response from his spokesman.*

**Correction:** *June 6, 2018*
*An earlier version of this article misspelled the name of one of the countries where Farkhad Akhmedov and his allies controlled companies. It is Liechtenstein, not Lichtenstein*

A version of this article appears in print on June 7, 2018, on Page A1 of the New York edition with the headline: A Bitter Custody Battle for a $500 Million Boat

| READ 141 COMMENTS |
|---|

**<u>EXHIBIT 3</u>**

This **DEED** is made                                    30 NOVEMBER 2016

**BETWEEN**

(1)     AVENGER ASSETS CORP., a company incorporated in the Republic of Panama, with its registered office address at Credicorp Bank Plaza, 26th Floor, Nicanor de Obarrio Avenue, 50th Street, P.O. Box 0832-02325, WTC, Panama City, Republic of Panama ("**AVENGER**")

**AND**

(2)     STERN MANAGEMENT CORP., a company incorporated in the Republic of Panama, with its registered office address at Credicorp Bank Plaza, 26th Floor, Nicanor de Obarrio Avenue, 50th Street, P.O. Box 0832-02325, WTC, Panama City, Republic of Panama ("**STERN**")


**RECITALS**

(i)     AVENGER is the registered owner of M/Y LUNA, a pleasure yacht, details of which are set out in the Schedule hereto.

(ii)    STERN is the registered shareholder of 100% of the issued share capital of AVENGER

(iii)   The Directors of AVENGER have declared a dividend *in specie* of *inter alia* M/Y LUNA to STERN as the registered shareholder of AVENGER.


**NOW THIS DEED WITNESSES THAT**

AVENGER hereby transfers all its rights title and interest in M/Y LUNA to STERN.

**EXECUTED AS A DEED** the date and year first before written.

| | |
|---|---|
| **EXECUTED AS A DEED** | ) _____ |
| for and on behalf of AVENGER ASSETS CORP. | ) |
| By | ) YVES DAMETTE |
| duly authorised | ) |
| in the presence of | ) _____ |
| | |
| **EXECUTED AS A DEED** | ) _____ |
| for and on behalf of STERN MANAGEMENT | ) |
| CORP. | ) |
| By | ) RUSSELL STOCKIL |
| duly authorised | ) |
| in the presence of | ) _____ |

This **DEED** is made     *01 December* 2016

**BETWEEN**

(1)    STERN MANAGEMENT CORP., a company incorporated in the Republic of Panama, with its registered office address at Credicorp Bank Plaza, 26th Floor, Nicanor de Obarrio Avenue, 50th Street, P.O. Box 0832-02325, WTC, Panama City, Republic of Panama ("**STERN**")

       AND

(2)    QUBO 2 ESTABLISHMENT, a company incorporated in the Principality of Liechtenstein, with its registered office address at Zollstrasse 2, P.O.B. 1611, FL-9490 Vaduz, Liechtenstein ("**QUBO 2**")


**RECITALS**

(i)    STERN is the registered owner of M/Y LUNA, a pleasure yacht, details of which are set out in the schedule hereto.

(ii)    STERN is a holder of the founder's rights in QUBO 2.

(3)    The Directors of STERN have resolved to transfer the ownership of M/Y LUNA to QUBO 2.


**NOW THIS DEED WITNESSES THAT**

STERN hereby transfers all its rights title and interest in M/Y LUNA to QUBO 2.

**EXECUTED AS A DEED** the date and year first before written.


**EXECUTED AS A DEED**
for and on behalf of STERN MANAGEMENT )
CORP                        )
By                            )   *Russell STOCKLE*
duly authorised               )
in the presence of          )   *Special Agent*


**EXECUTED AS A DEED**
for and on behalf of QUBO 2 ESTABLISHMENT )
By                            )
duly authorised               )   *YVES DAMETTE*
in the presence of          )   *Special Agent*

This **DEED** is made 8 March 2017

Certified as a true copy
*James FL   28/4/2017*
James FOSTER ACA
Institute of Chartered Accountants of
England and Wales
Membership no. 9072962

**BETWEEN**

(1)    **QUBO 2 ESTABLISHMENT**, incorporated and registered in the Principality of Liechtenstein whose company number is FL-0002.532.775-5 and whose registered office is at Zollstrasse 2, 9490 Vaduz, Principality of Liechtenstein (the "**Transferor**"); and

(2)    **STRAIGHT ESTABLISHMENT**, incorporated and registered in the Principality of Liechtenstein whose company number is FL-0002.541.523-0 and whose registered office is at Zollstrasse 2, 9490 Vaduz, Principality of Liechtenstein (the "**Transferee**").

**RECITALS**

(A)    WHEREAS the Transferor is the registered owner of the yacht M/Y Luna, a pleasure yacht, details of which are set out in the <u>Annex</u> hereto (the "**Yacht**"); and

(B)    WHEREAS the Transferor has been instructed by the holder of the founder's rights of the Transferor to transfer the ownership of the Yacht to the Transferee.

**NOW THIS DEED WITNESSES THAT**

The Transferor hereby transfers all its rights title and interest in the Yacht to the Transferee.

**EXECUTED AS A DEED** the date and year first before written.

| | |
|---|---|
| **EXECUTED AS A DEED** | ) _____ |
| for and on behalf of QUBO 2 ESTABLISHMENT | ) |
| by | ) WalPart Trust reg. |
| duly authorised | ) Director |
| in the presence of | ) |
| | ) *by: Ernst Walch* _____ |

| | |
|---|---|
| **EXECUTED AS A DEED** | ) _____ |
| for and on behalf of STRAIGHT ESTABLISHMENT | ) |
| by | ) Counselor Trust reg. |
| duly authorised | ) Director |
| in the presence of | ) |
| | ) *by: Andreas Schurti* _____ |

## ANNEX

### Particulars of M/Y Luna

| | |
|---|---|
| **Name of Vessel** | M/Y Luna |
| **Length Overall** | 101.15 metres |
| **Registry** | Republic of the Marshall Islands |
| **Home Port** | Bikini |
| **Official No./Registry No.** | V7NV8 |
| **Classification Society and Classification** | Lloyd's: 100A1 SC, Yacht, Mono, EP, G6, ICE Class 1D, LMC, UMS, DP(AM) PCAC 1/1 |
| **Type** | Pleasure Yacht |
| **G.R.T.** | 5,655 |
| **Where Lying** | Porto Caribe, Puerto Rico |

# **EXHIBIT 4**



# THE REPUBLIC OF THE MARSHALL ISLANDS

## REGISTRAR OF CORPORATIONS

RE: **STRAIGHT ESTABLISHMENT**

REG. NO.: **912376**

FILED: **April 26, 2017**

THIS IS TO CERTIFY that the within document is a true and correct copy of the **REGISTRATION AS A FOREIGN MARITIME ENTITY** of the above named entity, duly filed with the Registrar of Corporations effective on the date indicated above pursuant to the Marshall Islands Business Corporations Act.

WITNESS my hand and the official seal of the Registry on **July 23, 2018**.

_____

Lavanya Iruvanti
Deputy Registrar





# REGISTRATION

## OF

## STRAIGHT ESTABLISHMENT
### Reg. No. 912376

## AS A

## FOREIGN MARITIME ENTITY

### THE REPUBLIC OF THE MARSHALL ISLANDS

#### DUPLICATE COPY

The original of this Document was filed in
accordance with section 5 of the
Business Corporations Act on

**NON RESIDENT**

**April 26, 2017**

Deputy Registrar



**REGISTRATION AS A**
**FOREIGN MARITIME ENTITY**
**UNDER SECTION 119**
**OF THE BUSINESS CORPORATIONS ACT**

The *Management of Straight Establishment,* having adopted a resolution to apply to the Registrar of Corporations of the Republic of the Marshall Islands for registration as a Foreign Maritime Entity, hereby certify:

1. The name of the Entity is: Straight Establishment

2. The Entity was organized under the laws of **Principality of Liechtenstein** on the 17th day of February, 2017, as an **Establishment.**

3. The Entity has the power to own or operate vessels.

4. The Entity has the capacity to sue and be sued in its own name.

5. The address of the principal place of business of the Entity is:
   Zollstrasse 2
   Postfach 1611
   FL-9490 Vaduz
   Fürstentum
   Liechtenstein

   The Entity hereby undertakes to notify its Registered Agent in the Marshall Islands of any change in the address of its principal place of business by filing with its Registered Agent a written notice of such change.

6. The full name and address of the person vested under the law with management of the Entity at the time of this application is:
   Dr. iur Schurti Andreas, Zollstrasse 2, 9490, Vaduz

7. The address of the Registered Agent of the Foreign Maritime Entity within the Marshall Islands is Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH96960. The name of the Registered Agent upon whom process may be served at such address is The Trust Company of the Marshall Islands, Inc.

8. This Registration as a Foreign Maritime Entity shall be effective as of the filing of this document with the Registrar or Deputy Registrar of Corporations.

IN WITNESS WHEREOF, the undersigned has executed this Registration as a Foreign Maritime Entity on this 20th day of April, 2017,.

Authorized Person
Yves Damette
Director – Yacht Management
YCO S.A.M

*(Coat of Arms)*

Office of Justice
PRINCIPALITY OF LIECHTENSTEIN

COMMERCIAL REGISTER

# COMMERCIAL REGISTER EXTRACT

| Registration number | Legal nature | Registration | Termination | Transfer from: to: | 1 |
|---|---|---|---|---|---|
| FL-0002.541.523-0 | Establishment | 17.02.2017 | | | |

## All Registration Details

| Re | De | Name | | Ref | Domicile |
|---|---|---|---|---|---|
| 1 | | Straight Establishment | | 1 | Vaduz |

| Re | De | Capital | Paid In | Divisions | Re | De | Representative/ Address for Service |
|---|---|---|---|---|---|---|---|
| 1. | | CHF 30'000.-- | CHF 30'000.-- | | | 1 | c/o Counselor Trust reg.<br>Zollstrasse 2<br>9490 Vaduz |

| Re | De | Purpose | Re | De | Business address |
|---|---|---|---|---|---|
| 1 | | Investment and management of (its own) assets of any kind including real estate, direct and indirect acquisition and holding of participations in enterprises or other rights as well as their direct or indirect management; conduction of business on a commercial basis is in any event excluded.<br><br>In addition, the establishment is subject to the restrictions under Art. 64 SteG and does not carry out any economic activity in pursuit of its purpose. | | | |

| Re | De | Remarks | Ref | Date of Statutes |
|---|---|---|---|---|
| | | | 1 | 16.02.2017 |

| Re | De | Special facts | Ref | Publication organ |
|---|---|---|---|---|
| | | | 1 | Liechtensteiner Volksblatt |

| Re | De | Branch(es) | Re | De | Branch(es) |
|---|---|---|---|---|---|
| | | | | | |

| In | Ref | Diary-No. | Diary-Date | In | Ref | Diary-No. | Diary-Date |
|---|---|---|---|---|---|---|---|
| HRE | 1 | 1682 | 17.02.2017 | | | | |

| Re | Ch | De | Information regarding administration | Function | Signatory power |
|---|---|---|---|---|---|
| 1 | | | Counselor Trust reg., 9490 Vaduz | Member of the Board | individual signature |

Vaduz, 17.02.2017  17:53 AA

A manual or electronic extract from the Public Register of the Principality of Liechtenstein is only valid with an original certification or with an electronic official signature of the Office of Justice. Electronic documents of authorities printed on paper with an official signature and a signatory notice have the presumption of authenticity for themselves (Art. 5b SigG).

(Stamp) notarized
extract

Patricia ERNE
(Signature)

AMT FÜR JUSTIZ
FÜRSTENTUM LIECHTENSTEIN

HANDELSREGISTER

# HANDELSREGISTER-AUSZUG

| Registernummer | Rechtsnatur | | Eintragung | Löschung | Übertrag | |
|---|---|---|---|---|---|---|
| FL-0002.541.523-0 | Anstalt | | 17.02.2017 | | von:<br>auf: | 1 |

Alle Eintragungen

| Ei | Lö | Firma bzw. Name | Ref | Sitz |
|---|---|---|---|---|
| 1 | | **Straight Establishment** | 1 | Vaduz |

| Ei | Lö | Anstaltsfonds | Liberierung | Anstaltsanteile | Ei | Lö | Repräsentanz/Zustelladresse |
|---|---|---|---|---|---|---|---|
| 1 | | CHF 30'000.00 | CHF 30'000.00 | | | 1 | c/o Counselor Trust reg.<br>Zollstrasse 2<br>9490 Vaduz |

| Ei | Lö | Zweck | Ei | Lö | Geschäftsadresse |
|---|---|---|---|---|---|
| 1 | | Anlage und Verwaltung von (eigenem) Vermögen aller Art inklusive Immobilien, direkte und indirekte Übernahme und Halten von Beteiligungen an Unternehmen oder anderen Rechten sowie deren direkte oder indirekte Verwaltung; der Betrieb eines nach kaufmännischer Art geführten Gewerbes ist in jedem Fall ausgeschlossen.<br>Die Anstalt unterliegt den Beschränkungen von Art. 64 SteG und verfolgt in der Erfüllung ihres Zwecks keine wirtschaftliche Tätigkeit. | | | |

| Ei | Lö | Bemerkungen | Ref | Statutendatum |
|---|---|---|---|---|
| | | | 1 | 16.02.2017 |

| Ei | Lö | Besondere Tatbestände | Ref | Publikationsorgan |
|---|---|---|---|---|
| | | | 1 | Liechtensteiner Volksblatt |

| Ei | Lö | Zweigniederlassung (en) | Ei | Lö | Zweigniederlassung (en) |
|---|---|---|---|---|---|
| | | | | | |

| Zei | Ref | TB-Nr | TB-Datum | Zei | Ref | TB-Nr | TB-Datum |
|---|---|---|---|---|---|---|---|
| HRE | 1 | 1682 | 17.02.2017 | | | | |

| Ei | Ae | Lö | Angaben zur Verwaltung | Funktion | Zeichnungsart |
|---|---|---|---|---|---|
| 1 | | | Counselor Trust reg., 9490 Vaduz | Mitglied des Verwaltungsrates | Einzelunterschrift |

Vaduz, 17.02.2017 17:53 AA



Beglaubigter
Auszug:

Patricia ERNE

Ein manueller oder elektronischer Auszug aus dem Handelsregister des Fürstentums Liechtenstein hat nur Gültigkeit, sofern er mit einer Originalbeglaubigung oder mit einer elektronischen Amtssignatur des Amtes für Justiz versehen ist. Auf Papier ausgedruckte elektronische Dokumente von Behörden mit einer Amtssignatur und einem Signaturvermerk haben die Vermutung der Echtheit für sich (Art. 5b SigG).

# SPECIAL POWER OF ATTORNEY

The undersigned Counselor Trust reg. as sole director of Straight Establishment, an establishment existing under the laws of the Principality of Liechtenstein (the "Establishment"), hereby grants a Special Power of Attorney to **Mr Gary Wright**, Mr **Yves Damette** and **Mr Russell Stockil** to individually act with full power and authority to bind and represent the Establishment for the purpose of executing any documentation and/or taking any steps necessary or desirable to take ownership of M/Y Luna from Qubo 2 Establishment, a company incorporated under the laws of the Principality of Liechtenstein, to register such change of ownership in the Yacht Register maintained by the Maritime Administrator of the Republic of the Marshall Islands, and in this connection to register the Establishment as a Foreign Maritime Entity in accordance with Section 119 of the Marshall Islands Business Corporations Act.

This Special Power of Attorney is valid for 6 (six) months from the date issued.

Executed on 8 March 2017

Straight Establishment

(Andreas Schurti

for and on behalf of

Counselor Trust reg.)

# ARTICLES OF ASSOCIATION

## OF

## Straight Establishment

## VADUZ

- 2 -

<u>Name, seat and duration</u>

There exists under the name

### Straight Establishment

an establishment with legal personality as defined in Art. 534 et seq. PGR and having its seat in VADUZ. By resolution of the Board of Directors branches may also be set up in Liechtenstein and abroad and the seat of the establishment can be transferred abroad without prior dissolution.

All legal relationships constituted through the incorporation and existence of the establishment are subject to the laws in force at the place where the establishment has its seat. The establishment is subject to the ordinary jurisdiction of the court which is competent for the place where the establishment has its seat.

The duration of the establishment is not limited.

Art. 2

<u>Purpose</u>

Investment and management of (its own) assets of any kind including real estate, direct and indirect acquisition and holding of participations in enterprises or other rights as well as their direct or indirect management; conduction business on a commercial basis is in any event excluded.

In addition, the Establishment is subject to the restrictions under Art. 64 SteG and does not carry out any economic activity in pursuit of its purpose.

Art. 3

<u>Capital</u>

The capital of the establishment amounts to CHF 30'000.00 (in words: thirtythousand Swiss Francs), is fully paid in and is not divided into shares. It may be increased at any time by cash payments or donations of other assets or reduced to cover losses or payments to the beneficiaries.

- 3 -

Art. 4

Liability

The establishment is liable in all instances only with its
assets. There is no obligation on the holder of the founder's
rights or third parties to make additional contributions.

Art. 5

Beneficiaries

The capital of the establishment and income therefrom as well as
any net profits of the establishment shall be for the benefit of
the beneficiaries designated by the holder of the founder's
rights in written by-laws. Notarization of the by-laws is not
necessary. Both the original beneficiaries as well as their legal
successors may be designated revocably or irrevocably. If the
holder of the founder's rights is not able to designate
beneficiaries for whatever reason, this power passes to the Board
of Directors.

If the holder of the founder's rights has not designated any
beneficiaries, he himself shall be beneficiary.

Art. 6

Bodies of the establishment

The bodies of the establishment are:

a)      the holder of the founder's rights

b)      the Board of Directors

c)      the auditors (optional)

Art. 7

Holder of the founder's rights

The supreme body of the establishment is the holder of the
founder's rights.

He has the following powers:

- 4 -

a)   appointment  and  removal  of  the  Board  of  Directors,  the
     auditors and the beneficiaries,

b)   alteration  of  the  articles  of  association  and  the  issue  and
     amendment of by-laws,

c)   distribution of the net profits,

d)   dissolution and liquidation of the establishment.


Art. 8

Succession

The  founder's  rights  belonging  to  one  or  more  persons  may  be
assigned  in  toto,  otherwise  transferred  or  bequeathed,  however
they cannot be pledged or otherwise encumbered.

If  the  founder's  rights  are  held  by  several  persons,  all
resolutions  need  the  approval  of  all  holders  of  the  founder's
rights in order to be valid.


Art. 9

Board of Directors

The  Board  of  Directors  consists  of  one  or  more  natural  or  legal
persons.

The  management  of  the  establishment  rests  with  the  Board  of
Directors.  It  represents  the  establishment  towards  third  parties
in a legally binding manner.

The  management  and  representation  of  the  establishment  may  be
assigned  by  the  Board  of  Directors  to  other  natural  or  legal
persons,  whose  signing  rights  shall  be  determined  by  the  Board  of
Directors.

It  decides  upon  all  matters  which  are  not  reserved  to  the  holder
of  the  founder's  rights  according  to  Art.  7  of  these  articles  of
association.

Members  of  the  Board  of  Directors  are  appointed  for  an  indefinite
period  of  time.  However,  each  member  of  the  Board  of  Directors
has the right to resign at any time without giving reasons.

If  the  Board  of  Directors  consists  of  only  one  person,  this
person  adopts  all  resolutions  alone.  If  two  members  are

- 5 -

appointed, unanimity is required to adopt resolutions. However, if it consists of three or more members, the majority of the votes casted decides. Written resolutions (resolution by circulation) may also be passed provided that the foregoing provisions requiring unanimity or majority, as the case may be, are complied with.

The Board of Directors is self-constituting.


Art. 10

Prohibition of competition

The restriction under Art. 183 PGR (prohibition of competition) is excluded. This restriction shall apply only if expressly stipulated in writing at the time of appointment of a new member of the Board of Directors.

Art. 11

Auditors

The holder of the founder's rights is entitled, but not obliged, at any time to elect an audit board of one to three members or to appoint a trust company instead, to audit the annual accounts and to which other functions may be assigned. Details regarding the scope of duties and remuneration of the auditors are to be determined by the Board of Directors.


Art. 12

Signing rights

Signing authority shall be determined by the Board of Directors insofar as the holder of the founder's rights himself has not determined the same.


Art. 13

Accounting

At the end of each calendar year, a statement of assets and liabilities shall be drawn up.

- 6 -

Art. 14

Public announcements

Any public announcements required by law have to be made either
by registered mail or by publication in the newspaper
"Liechtensteiner Volksblatt".


Art. 15

Dissolution

The establishment may be dissolved and liquidated by the holder
of the founder's rights within the limits prescribed by law.

When resolving to dissolve the establishment, the holder of the
founder's rights shall decide upon the application of the
liquidation surplus and, if it is to be given to the
beneficiaries, how it shall be distributed to them.


Art. 16

Representation

The legal representative under Art. 239 et seq. PGR shall
initially be appointed in the deed of formation and thereafter by
the Board of Directors.


Vaduz, 16 February 2017


                              The founder:

                         Counselor Trust reg.

**EXHIBIT 5**



....................

## JUDICIARY OF
## ENGLAND AND WALES

**19th April 2018**

### PRESS SUMMARY

### TATIANA AKHMEDOVA V. FARKHAD AKHMEDOV AND OTHERS

**THE HON. MR JUSTICE HADDON-CAVE**

## INTRODUCTION

1. On 15th December 2016, the Court granted ancillary financial relief to the Applicant, Mrs Tatiana Akhmedova ("W") against the First Respondent, Mr Farkhad Akhmedov ("H"), in the sum of £453,576,152 (*AAZ v BBZ and Others (Financial Remedies: Sharing Principle: Special Contribution)* [2016] EWHC 3234 (Fam), [2018] 1 FLR 153) ("the Judgment").

2. On 20th December 2016, the Court granted a world-wide Freezing Order and made a Financial Remedy Order pursuant to which (i) H was ordered to pay a lump sum of £350,000,000 to W and transfer certain property, (ii) various Panama and Liechtenstein corporate entities (Cotor, Qubo 1 and Qubo 2) were made jointly and severally liable with H, (iii) transfers of a modern art collection and cash from Cotor to Qubo 1 and/or Qubo 2 were set aside and (iv) W was granted liberty to apply for enforcement purposes.

3. It is apparent that H has taken numerous elaborate steps to conceal his wealth and evade enforcement of the Judgment. These are illustrated in the attached up-to-date organogram (annexed to the judgment handed down today).

4. Since December 2016, W has been involved in litigation to enforce the Judgment in various jurisdictions around the world. W has achieved some success recently in the Isle of Man and Dubai:

    (1) W obtained court orders in the Isle of Man in respect of H's helicopter and private jet - and intends to seek orders for the sale of these assets, but has been met with an argument by H that the Manx company that holds one of those assets owes substantial debts to Avenger Assets Corporation ("Avenger"), the Intended Seventh Respondent in these proceedings.

    (2) W obtained orders in the courts of the Dubai International Financial Centre ("DIFC") in respect of H's yacht, M.V "Luna", title to which is currently held by another Liechtenstein 'Anstalt', Straight Establishment ("Straight"), the Intended Sixth Respondent to these proceedings.

5.      On 28th March 2018, the Court heard W's application for further relief and made a number of the orders to aid W's enforcement of the Judgment against H in the Isle of Man and Dubai, including:

   (1)     the joinder and service of Avenger and Straight to the proceedings;

   (2)     declarations that M.V. "Luna" is beneficially owned by H;

   (3)     orders setting aside a cash transaction of €260 million which enabled M.V. "Luna" to be acquired by Avenger;

   (4)     an order piercing Straight's 'corporate veil';

   (5)     an order that Straight transfers M.V. "Luna" to W;

   (6)     in default of transfer, orders that (a) Straight pays US$487,278,000 (the insurance value of the yacht) or £346,600,841 (the capital value of the yacht) to W and (b) Avenger pays of €260 million to W;

   (7)     orders rendering Straight and Avenger jointly and severally liable with H to W; and

   (8)     an extension of the Freezing Order.


6.      The Judgment handed down today (*Akhmedova v. Akhmedov and others (Enforcement Orders)* [2018] EWFC 23 (Fam)) sets out the written reasons for the grant of these further orders.   A copy of the referenced organogram annexed to the judgment is attached overleaf.


**NOTE:  This Summary is provided to help in understanding the Court's decision.  It does not form part of the reasons for the decision.  The full judgment of the Court is the only authoritative document.  Judgments are public documents and are available at: www.bailii.org.uk**

Press Summary
Tatiana Akhmedova v Farkhad Akhmedov and others





MR JUSTICE HADDON-CAVE
Approved Judgment

Akhmedova v Akhmedov and ors

H → settlor protector → The Akhmedov 2013 Discretionary Trust 2 October 2013; Bermuda → Principal Beneficiary Discretionary Beneficiaries W, children → H

Declaration of trust 17/3/15
H Assigned his interest in share capital in companies 1 – 4 to C Ltd

Trustee
Woodblade Limited
registered in Cyprus
Sole director H

funds sent to H directly

1
Sunningdale Ltd
reg in Cyprus
Nominee for Sedell Finance Ltd,
registered in BVI

60%

9, Solyanka Street Moscow

2
Avenger Assets Corp
Registered in Panama

Alleged debt owed to Avenger of $7,588,949.38

M.V. "Luna"
Registered in Marshall Islands 20/2/14
H bought for €260m 25/3/14 H
Vessel assigned to Tiffany Ltd, Dec 14
Tiffany sold vessel to Avenger €260m
from Cotor → H's account → Avenger
2015 € 42 m refit

3
Carolina Ltd
registered in Isle of Man

Global 6000 Plane
31/3/14 H purchased aircraft for $52.6m
24/4/14 H assigned aircraft to Carolina Ltd
H's estimate value $35m

4
Lucy Ltd
registered in Isle of Man

EC 15 Helicopter
31/3/14 H bought helicopter for €10m. H assigned to Lucy Ltd.
H's estimate value $8m.

5
Cotor Investment SA
registered in Panama

UBS Portfolio (value US$890,065,115)
Works of art (value £90,581,865)

Qubo 1 (Liechtenstein)

Qubo 1 (Liechtenstein)

Stern Management Corp (Panama)

M.V. "Luna" transferred on 30/11/16 – day 2 of trial

Qubo 2 (Liechtenstein)

M.V. "Luna" transferred 1/12/16

Qubo 2 director = Walpart Trust Reg.
Walpart Trust directors = same as Counselor Trust

Straight Establishment (Liechtenstein)

M.V. "Luna" transferred on 8/3/17.
Straight director = Counselor Trust Reg = same directors as Walpart Trust

21 of 21



Neutral Citation Number: [2018] EWFC 23 (Fam)

Case No: FD13D05340

**IN THE HIGH COURT OF JUSTICE**
**FAMILY DIVISION**
**SITTING AT THE CENTRAL CRIMINAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 19/04/2018

Before :

**MR JUSTICE HADDON-CAVE**
- - - - - - - - - - - - - - - - - - - -
**Between :**

TATIANA AKHMEDOVA                                             **Applicant**
- and -
(1) FARKHAD TEIMUR OGLY AKHMEDOV
(2) WOODBLADE LIMITED
(3) COTOR INVESTMENT SA
(4) QUBO 1 ESTABLISHMENT
(5) QUBO 2 ESTABLISHMENT                                        **Respondents**
- and -
(6) STRAIGHT ESTABLISHMENT
(an establishment formed in the Principality of Liechtenstein)
(7) AVENGER ASSETS CORPORATION
(a Panamanian company)

**Intended Respondents**

- - - - - - - - - - - - - - - - - - - -

**Mr Dakis Hagen QC and Mr Andrew Holden**
(instructed by **Withers LLP**) for the **Applicant**
**The Respondents were not present or represented**

Hearing date: 21ˢᵗ March 2018
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

## MR JUSTICE HADDON-CAVE :

## INTRODUCTION

*Procedural history*

1. A trial took place before me between 29th November and 5th December 2016 of an application for ancillary financial relief sought by the Applicant, Mrs Tatiana Akhmedova ("W") against the First Respondent, Mr Farkhad Akhmedov ("H"). H did not appear at the trial and was not represented.

2. On 15th December 2016, I gave judgment granting W ancillary financial relief against H in the sum of £453,576,152, comprising 41.5% of the total marital assets (*AAZ v BBZ and Others (Financial Remedies: Sharing Principle: Special Contribution)* [2016] EWHC 3234 (Fam), [2018] 1 FLR 153) ("the Judgment").

3. On 20th December 2016, I made a Financial Remedy Order ("the Main Order") giving effect to my Judgment (*AAZ v BBZ and Ors* [2016] EWHC 3361 (Fam)). I also granted a world-wide Freezing Order ("the Freezing Order").

4. Pursuant to the Main Order:

   (1) H was ordered to pay a lump sum of £350,000,000 to W and to transfer certain property to W.

   (2) Various Panama and Liechtenstein corporate entities (Cotor, Qubo 1 and Qubo 2), which the Court had found to be (in the case of Cotor) a nominee and bare trustee for H and (in the case of Qubo 1 and Qubo 2) no more than 'ciphers' and the *alter ego* of H, were made jointly and severally liable for payment of the lump sum.

   (3) Transfers of a modern art collection and cash from Cotor to Qubo 1 and/or Qubo 2 were set aside pursuant to s.37 of the Matrimonial Causes Act 1973 ("MCA 1973") and/or s.423 of the Insolvency Act 1986 ("IA 1986") on the basis that those transfers were undertaken at an undervalue.

   (4) W's claims would only be dismissed when there had been "*full and complete compliance with this order*" (paragraph 21).

   (5) There was liberty to apply to bring "*any other applications for enforcement purposes under s. 37 of the MCA 1973 and/or s. 423 of the Insolvency Act 1986*" (paragraph 27).

5. The Main Order, therefore, specifically left open the prospect of further relief under the Matrimonial Causes Act 1973. This was in accordance with the usual practice and had the effect of keeping the proceedings on foot (as the Court of Appeal confirmed in *Kerman v. Akhmedova* [2018] EWCA 307 at paragraph [28]).

6. On 8th June 2016, I refused an application filed on behalf of W on 7th June 2016 seeking an order for subpoena *duces tecum* against Ross Henderson, the former head of H's family office in Zug, Switzerland.

7. Since December 2016, W has been involved in litigation to enforce the Judgment against H in various jurisdictions around the world. W's efforts have been frustrated. W has achieved some success recently in the Isle of Man and Dubai:

(1) W has obtained court orders in the Isle of Man in respect of a helicopter and a private jet belonging to H – and intends to seek orders for the sale of these assets – but has been met with an argument by H that the Manx company that holds one of those assets owes substantial debts to Avenger Assets Corporation ("Avenger"), whom W seeks to join as the Intended Seventh Respondent in these proceedings.

(2) W has obtained orders in the courts of the Dubai International Financial Centre ("DIFC") in respect of the yacht, M.V. "Luna", title to which is currently held by another Liechtenstein 'Anstalt', Straight Establishment ("Straight"), whom W seeks to join as the Intended Sixth Respondent to these proceedings.

*This application for further relief*

8. On 1st March 2018, pursuant to the liberty to apply, W issued an application in this Court seeking the following further orders to assist her in the enforcement of the substantive relief granted by the Main Order:

(1) the joinder of Avenger and Straight to proceedings under FPR r. 9.26B;

(2) suitable orders for service by alternative means deeming such service to have taken place on all respondents served with this application on 2 March 2018;

(3) declarations recognizing that M.V. "Luna" is beneficially H's asset and that Avenger and Straight are his alter ego;

(4) an order piercing Straight's 'corporate veil';

(5) declarations that Avenger and Straight are H's privies and through H have submitted to the jurisdiction;

(6) an order against Straight that it transfer M.V. "Luna" to W;

(7) orders under s. 37 MCA 1973 and s. 423 IA 1986 setting aside the cash transaction of €260m on 15 December 2014 which enabled M.V. "Luna" to be acquired by Avenger and an order that Avenger pay a sum representing the capital value of M.V. "Luna" to W (€260 million);

(8) orders under s. 37 MCA 1973 and s. 423 IA 1986 setting aside the transaction(s) by which Straight came to hold M.V. "Luna";

(9) in default of the transfer of M.V. "Luna" to W, orders that Straight do pay the sum of US$487,278,000 (the current insurance value of M.V. "Luna" or £346,600,841 (the capital value of M.V. "Luna") to W and that Avenger do pay the sum of €260 million to W;

(10)    orders rendering Straight and Avenger jointly and severally liable under the lump sum order in paragraph 13 of the Main Order so that the H's liability is diminished *pro tanto* following any such payment; and

(11)    an extension of the Freezing Order.

9.      The application is supported by affidavits of Ms Michaelides filed by W's solicitors, Messrs. Withers. Ms Michaelides explains the enforcement steps taken in the Isle of Man, Liechtenstein, Switzerland and DIFC/Dubai and H's attempts to frustrate enforcement against his assets by the 'interposition' of corporate entities. I accept her evidence.

10.     W is represented by Dakis Hagen QC and Andrew Holden of Counsel and Messrs Withers. The Respondents and Intended Respondents did not appear and were not represented before me on 21st March 2018. I deal with service below. W submits that time is of the essence in the enforcement proceedings in the DIFC and the IOM.

**The Isle of Man enforcement proceedings**

11.     W registered the Judgment against H in the Isle of Man on 3rd August 2017. She also obtained a freezing injunction and disclosure orders, which revealed that three Isle of Man companies that hold the helicopter and the private yet – namely Carolina Limited ("Carolina"), Lucy Limited ("Lucy"), and Tiffany Limited ("Tiffany") – were, in fact, held by nominees for H's sole benefit.

12.     The directors of the Manx holding companies procured or permitted that the helicopter and the private jet be returned to Germany and the UK, respectively.

13.     W is seeking to enforce the Judgment (as registered in the Isle of Man) against these assets. However, this has been met by an allegation that the Manx holding companies owe substantial sums of money to H, Cotor and Avenger.

14.     Ms Michaelides explains there is no evidence to support the assertion that these debts are due. W submits that the obvious inference is that H is manufacturing these alleged debts in order to attempt to dilute his equity in the Manx holding companies, so as to prevent W from enforcing the Judgment against his interest.

15.     In the case of the debts claimed to be owed to H personally and to the corporate creature against which the court has already entered Judgment (Cotor), W seeks Third Party Debt Orders in the Isle of Man, so that execution can be levied against the alleged debts themselves.

16.     However, that solution is not currently available in respect of Avenger because orders were not originally made against Avenger itself. W submits that the court should now make such orders because it is clear that Avenger is simply another of H's corporate 'ciphers'. Entering judgment against Avenger would be efficacious because it would enable W to garnish any such alleged debts owed to Avenger as a mechanism for enforcement of the Judgment.

17.     The following points are pertinent:

    (1)     In 2014, H transferred the proceeds of sale of his stake in Northgas into Cotor, which is a Panamanian 'bearer share' company, which this Court found to be H's nominee. There is no evidence of any consideration having been paid by Cotor for receipt of these assets (Judgment, paragraph 77).

    (2)     In February 2014, H entered into a contract to purchase M.V. "Luna" in his own name for €260 million. The vessel was placed in the name of Tiffany (Judgment, paragraph 67).

    (3)     In December 2014 and, significantly, after W says that the marriage finally came to an end, Tiffany 'sold' M.V. "Luna" to Avenger (Judgment, paragraph 67). H owned Avenger and the funds for this purported 'purchase' came from H's own bank account (Judgment, paragraph 68).

    (4)     In March 2015, H then purported to assign his shares in Avenger and other companies to a Bermuda law discretionary trust, of which he himself was the settlor, principal beneficiary and protector (Judgment paragraph 93). This was a transparent attempt to hide H's interest in the companies that owned the luxury assets – and by extension to hide those assets, including M.V. "Luna" – as a result of the threat of W's claims (Judgment, paragraph 94). These transfers were set aside on the basis that they were made by H with the intention of defrauding his creditors (Main Order, paragraph 17).

    (5)     On 15th December 2014, Avenger received the sum of €260,000,000 from H's bank account in order to 'purchase' M.V. "Luna" from Tiffany, despite the fact that Tiffany was just another H-owned company and had received an assignment of the contract to acquire the yacht directly from H himself. Avenger's registered agent and Cotor's registered address were the same. Cotor was H's nominee.

18.     In the circumstances, I find and hold that the transfer by H of €260 million to Avenger, and the payment of that sum by Avenger to Tiffany, was a deliberate mechanism by which H tried falsely to pretend that the ownership of M.V. "Luna" was held notionally by a Panamanian company, rather than by an Isle of Man company (where enforcement is possible).  The timing of the alleged change in ownership is telling, *i.e.* at the end of 2014 after it was clear that the marriage finally ended (Judgment, paragraphs 38 and 50).

19.     Accordingly, for these reasons, I make the orders sought against Avenger directly.

**The Dubai enforcement proceedings**

20.     W's lawyers, Messrs Withers, discovered that in or about October 2017, M.V. "Luna" sailed into Dubai and was put into dry-dock for maintenance.  This may have been because H assumed that Dubai was well beyond the reach of an English Court judgment.  It appears that Messrs Withers, however, knew better.  They knew that, in fact, the Courts of DIFC (the international commercial freezone in Dubai) have the following special attributes: (a) they are courts of the Common Law which apply Common Law principles regarding the enforcement of foreign judgments; (b) they

have a reciprocal enforcement relationship with the Courts of Dubai itself; and (c) they exercise a so-called 'conduit jurisdiction', by which judgments that are registered in the DIFC Courts can then be taken to the Courts of Dubai for execution. Accordingly, it is possible for parties to seek to execute foreign judgments in Dubai *via* the DIFC Courts. It is by this route that W is now seeking to execute the Judgment against M.V. "Luna" and seeks further orders from this originating Court to do so.

*Histology of evasion*

21. The histology of H's dealings with M.V. "Luna" are redolent of his elaborate and contumacious campaign to evade and frustrate the enforcement of the Judgment debt against him. New facts have recently come to light and been drawn to this Court's attention which reinforce that picture. The true sequence of events appears to be as follows.

22. H transferred M.V. "Luna" into the name of Tiffany, but then procured a dummy 'sale' of the vessel to Avenger, using funds from his own bank account. However, unbeknown to W and this Court, during the trial in December 2016, Avenger did not, in fact, continue to hold title to M.V. "Luna". It transpires that H had taken a rapid series of further surreptitious steps to attempt to place his yacht further beyond the reach of enforcement. The sequence of events was as follows. On 30th November 2016 (*i.e.* the second day of the trial before me), M.V. "Luna" was transferred from Avenger to another Panama entity, Stern Management Corporation ("Stern"). On 1st December 2016, M.V. "Luna" was transferred by Stern to Qubo 2 and was re-registered as a Marshall Islands vessel. On 20th December 2016, this Court found that Qubo 2 was no more than H's 'cipher' and *alter ego* and made an order that Qubo 2 was jointly and severally liable to W for the sum of £350 million. On 28th December 2016, the Lichtenstein Court made a freezing order against Qubo 2 prohibiting the disposal of M.V. "Luna" and made payment orders against Qubo 2.

23. In breach of the Orders of the English and Lichtenstein Courts, however, on 8th March 2017, Qubo 2 transferred M.V. "Luna" to Straight. Straight appears to be current title-holder of the vessel (at least on current information).

24. The newly created vehicle, Straight, would appear to be the antithesis of its name. The transfer M.V. "Luna" by Qubo 2 to Straight was made despite the fact that Qubo 2 had been made jointly and severally liable for payment of the lump sum award under the Judgment, and in breach of breach of the freezing injunction granted by the Liechtenstein Courts in W's favour as aforesaid.

25. In my judgment, it is clear that Straight is simply another 'cipher' and *alter ego* of H, and another attempt by H to evade enforcement. Straight is another Liechtenstein 'Anstalt'. Straight operates from the same address as Qubo 2. Straight has the same individual directors who operate Qubo 2, *i.e.* one of H's known 'ciphers'. Straight was incorporated on 17th February 2017, after Judgment had been entered against H and Qubo 2. The timing is again telling. Straight was incorporated, and the vessel transferred from Qubo 2 to Straight, in the midst of W's initial attempts to enforce the Judgment against Qubo 2 in Liechtenstein. On 23rd February 2017, Qubo 2 appealed the orders made by the Liechtenstein Court on 28th December 2017. The freezing

order was upheld.  Title to the vessel was, nevertheless, transferred by Qubo 2 to Straight on 8th March 2017.

26.     In my judgment, there is an irresistible inference that these actions were taken at H's instruction, and in a deliberate attempt to place M.V. "Luna" beyond the reach of the orders that the English court had made against Qubo 2 and which W was threatening to execute in Liechtenstein.

27.     I have illustrated these recent developments in the attached amended organogram (which is the updated version of the one attached to my Judgment of 15th December 2016).

*Dubai proceedings*

28.     W instructed counsel and lawyers in Dubai (Michael Black QC, Andrew Holden and Messrs Fitche & Co).  On 8th February 2018 W obtained a freezing injunction in the DIFC against H and Straight which prevented them from disposing of or dealing with M.V. "Luna".  Acting as a delegate of the DIFC Courts, and on the basis of the DIFC freezing injunction, on 13th February 2018 the Court of Dubai granted a precautionary attachment of M.V. "Luna".   As a result, M.V. "Luna" was effectively impounded in Port Rashid where she remains under court order.

29.     Straight immediately instructed its own counsel and lawyers who then applied to set aside the freezing injunction on the basis that the DIFC only has personal enforcement jurisdiction over H and not Straight.  Straight's challenge to the continuation of the DIFC freezing injunction was, therefore, on the basis that the English Court had only entered judgment directly against H and not against Straight.  It should be noted, however, that (i) Straight was incorporated two months after the English Judgment was entered and (ii) the transfer of M.V. "Luna" was effected by Qubo 2 in breach of the Freezing Order (see above).

30.     On 8th March 2018, Straight obtained an urgent hearing of its application to set aside the DIFC order.   On 11th March 2018, the DIFC Courts dismissed Straight's application and ordered the continuation of its freezing injunction, with written reasons to follow.

31.     The DIFC Courts also declined to have an urgent appeal against its decision listed for the week commencing 18th March 2018.  W submitted that this was a transparent attempt by Straight (and H) to overturn the DIFC freezing injunction prior to the hearing of the current application before the English Court listed for 21st March 2018. Straight was named as the Second Respondent in those proceedings and H was named as the First Respondent in those proceedings.  Straight's lawyers admitted that they were funded by a third party.  I infer that this must be H.

32.     In the course of the hearing before me on 21st March 2018, the DIFC Courts' reasons were published and handed up to me.  In a 50-paragraph detailed judgment, H.E. Justice Ali Al Madhani set out the full history of the English proceedings and the *gravamen* of the English Judgment and said this:

> "44.  In my judgment, I agree with the argument put forward by
> the Applicant that as a matter of fundamental policy, this court

– like any other court of justice – must be in a position to respond to fraud and deliberate evasion. It would deny the Court's jurisdiction of much of its practical effect if it were possible to avoid the enforcement of a judgment in the DIFC by the simple expedient of placing one's assets within a corporate entity in an offshore 'secrecy' jurisdiction, see Beatson LJ in *JSC BTA Bank v Ablyazov* [2014] 1 WLR 1414 [36];

> a. "The jurisdiction to make a freezing order should be exercised in a flexible and adaptable manner so as to be able to deal with new situations and new ways used by sophisticated and wily operators to make themselves immune to the Courts' orders or deliberately to thwart the effective enforcement of those orders".

45. This 'flexibility principle' was referred to with approval by Lewison LJ in *JSC Mehzprom Bank v Pugachev* [2016] 1 WLR 160 who said at [20] in the context of the construction of a freezing order, but making a point of principle of general application:

> "It would, I think, be a matter of concern if a person could make himself judgment-proof merely by setting up discretionary trusts or, as Patten LJ said, a Liechtenstein Anstalt".

46. Further, I refer to the dictum of Robert Walker J (as he then was) in *International Credit & Investment Co (Overseas) Ltd v Adham* [1998] BCC 134, at 136:

> "the Court will, on appropriate occasions, take drastic action and will not allow its orders to be evaded by manipulation of shadowy offshore trusts and companies formed in jurisdictions where secrecy is highly prized and official regulation is at a low level"

47. Accordingly, this Court's jurisdiction to ratify and enforce foreign judgments extends to the making of orders against corporate entities such as the Second Respondent, if it can be shown that they are being used to conceal the assets of the judgment debtor.

48. As to this case and in order or to the level of granting a Freezing injunction only I am satisfied that the Applicant has a good arguable case to believe that Vessel Luna, held through Straight the Second Respondent, was and continues to be owned and controlled by Mr Akhmedov the First Respondent personally which gives this Court the jurisdiction and the power to enforce against it with a view to enforcing a recognised English Judgment."

33.     H.E. Justice Ali Al Madhani concluded as follows:

> "50.   It is important to take into account that the Freezing
> Injunction was also granted based on the Applicant's intention
> to obtain judgment against Mr Akhmedov which extends to
> enforcement against Straight as his corporate creature in the
> English High Court.
>
> 51.   Furthermore, the Applicant put forward evidence that an
> application against the Second Respondent was issued in the
> English High Court on 1 March 2018 and the hearing of that
> application is due to take place on 21 March 2018.   In this
> regard, the Freezing Injunction preserves the position pending
> the entry of judgment in England, and the ratification and
> enforcement of that judgment in the DIFC."

34.     I take full account of the judgment of H.E. Justice Ali Al Madhani and express the
gratitude of this Court to the DIFC for its valuable assistance and comity.

*W's submissions*

35.     Mr Dakis Hagen QC submits that entry of judgment against Straight in these
(English) proceedings would self-evidently be of real value in the DIFC proceedings.
First, because the DIFC Courts has statutory jurisdiction to ratify foreign judgments, a
judgment directly against Straight would strengthen W's argument that the DIFC
Courts have jurisdiction over Straight. H is clearly Straight's privy; H has submitted
to the jurisdiction of this Court in these proceedings; accordingly, Straight will be
incapable of contending other than that it has done so as well.   Second, because
Straight's challenge to the DIFC freezing injunction is based on the allegation that the
DIFC Courts have no jurisdiction over Straight, the entry of judgment against Straight
would defeat, or at least greatly assist in defeating, its jurisdictional challenge. Third,
because W's substantive claim against Straight in the DIFC is based on the contention
that Straight is H's 'cipher' and *alter ego*. If this Court pierces the 'corporate veil' of
Straight, it is believed that ultimately this will assist in securing the same form of
relief against Straight in the DIFC, on the basis the DIFC Courts  will pay regard to
the findings and orders made by the English court in this respect.

36.     Mr Hagen QC contends that, by reason of paragraphs 21 and 27 the Main Order, any
claim under the general law incidental to the granting of matrimonial orders remains
fully open.   On this basis, he seeks relief in the form of declarations of beneficial
ownership and piercing of the 'corporate veil'.

## ANALYSIS

### (1)     Joinder and service

37.     W seeks the joinder of Avenger and Straight pursuant to FPR rule 9.26B on the basis
that (i) it is desirable to add the new parties so that the court can resolve all the
matters in dispute in the proceeding, or (ii) there is an issue involving the new parties
and an existing party which is connected to the matters in dispute in the proceedings
and it is desirable to add the new party so that the court can resolve that issue.

38.     W submits that the Respondents and Intended Respondents to this application have been properly served and had more than the requisite 7 days' notice of this application pursuant to Part 18. W sent the application and supporting materials to H, Qubo 2, Avenger and Straight by a variety of methods. There is no requirement for permission to serve outside the jurisdiction in matrimonial proceedings (FPR rule 6.41). I accept Ms Michaelides' evidence regarding the steps taken to serve this application and supporting material and that all such Respondents and Intended Respondents received the documents on 2nd March 2018.

39.     W seeks an order validating the steps taken to serve the application and supporting materials on the Respondents and Intended Respondents. W further submits that earlier service on H should, in any event, be deemed to be good service on Avenger and Straight.

*The principles*

40.     The following principles emerge from the authorities:

   (1)     The legal principles of common law and equity which have to be applied in the Family Division and in the Family Court are "*precisely the same as in the Chancery Division, the Queen's Bench Division and the County Court*" (*per* Sir James Munby, President of the Family Division in *Kerman v. Akhmedova* [2018] EWCA Civ 307 at [21]-[22]). In other words, courts exercising family jurisdiction "*do not occupy a desert island in which general legal concepts are suspended or mean something different*" (*per* Lord Sumption JSC in *Prest v Petrodel Resources Ltd and others* [2013] UKSC 34, [2013] 2 AC 415, at paragraph [37]).

   (2)     The Court has power retrospectively to validate a step that brings a claim or document to be served to the attention of the defendant as being good service. This is implicit in CPR rule 6.37(5)(b)(i) which gives the court discretion to "*give directions about the method of service*" in cases of service out, or is to be implied generally into the rules for service out (*per* Lord Clarke of Stone-Cum-Ebony JSC in *Abela v. Baadarani* [2013] 1 WLR 2043 paragraph [20]).

   (3)     Notwithstanding the absence of an equivalent of CPR rule 6.37(5)(b)(i), the Court had jurisdiction under the FPR to permit service out of the jurisdiction by alternative means and urgency will often be a feature of family cases especially those involving children (*per* Moylan LJ in *Wilmot v Maughan* [2017] EWCA Civ 1668 at paragraphs [127]-[129]). It follows that the court must have jurisdiction under the FPR retrospectively to validate alternative service.

   (4)     Save where there is a multilateral or bilateral convention governing service in the foreign jurisdiction - in which case a more stringent "*exceptional circumstances*" test applies (*c.f. Marashen Ltd v Kenvett Ltd* [2018] 1 WLR 288) - the jurisdiction to authorise or validate service by alternative means is established if the serving party can show "*a good reason*" for effecting service in that way. The use of the indefinite article "*a good reason*" is significant: one good reason only is sufficient (*per* Atkins LJ in *Kaki v National Private Air Transport Co* [2015] 1 CLC 948, at [28]).

(5)     The mere fact that service by alternative means will be quicker and more convenient will not, of itself, constitute *"a good reason"* justifying service by those alternative means. However, proof of lengthy delay in the context of the case itself if the service treaty method is used may constitute a good reason to authorise alternative service (*per* Haddon-Cave J in *Bill Kenwright Ltd v Flash Entertainment FZ LLC* [2016] EWHC 1951 (QB), [54]; and see David Foxton QC in *Marashen v Kenrett* [2018] 1 WLR 288 at [55]-[56]).

(6)     Where service by alternative means is sought, it must be shown that such means would not contravene the laws of the territories in which service has been effected (see *Abela* (*supra*) and *Embassy of Brazil v de Castro Cerqueira* [2014] 1 WLR 3718, at paragraph [29]).

*Application of the principles to this case*

41.     In my judgment, the following points are pertinent and amount collectively to *"a good reason"* for the Court to exercise its discretion to validate service by alternative means in this case:

(1)     First, it is clear on the unchallenged evidence of Ms Michaelides that service *via* judicial channels would be likely to take weeks, months or even years.

(2)     Second, the context of the present application is relevant, namely, the post-judgment enforcement phase where H has over the past 18 months repeatedly demonstrated a willingness to take rapid and multifarious steps to evade enforcement at every turn.

(3)     Third, the urgency and time-critical nature of the present application is demonstrated by Straight's (*i.e.* H's) recent attempt to have Straight's jurisdictional challenge in Dubai expedited so as to come on before the hearing of this application in England.   It is clear that time is of the essence in the enforcement proceedings in the DIFC and the IOM.

(4)     Fourth, there is self-evidently a continuing risk that H will take every step available to him to seek to render the orders and judgments of this Court nugatory unless the Court acts with expedition.

(5)     Fifth, further and in any event, it is important for the process of enforcement against H's assets to proceeds with expedition so that they are not further dissipated or their value diminished in the meantime.

(6)     Sixth, local lawyers have confirmed that service by the methods used would not contravene the laws of the territories in which service has been effected.

42.     In my view, in any event, the above circumstances would also amount to *"exceptional circumstances"* under the more stringent test required in Hague Convention State cases.  The exceptional steps taken by H to evade enforcement in this past 18 months give rise to exceptional circumstances.

43.     Further, and in any event, for similar reasons to those in my first Judgment where I held that earlier service on H was deemed good service on Cotor, I hold that service of this application on H is good service on Avenger and Straight (see Judgment, paragraphs [122]-[129]).

44.     For these reasons, in my view, service by alternative means on the Respondents (see above) should be permitted and validated and I so order.  Accordingly, I declare that service of the application is deemed to have taken place on the Respondent and the Intended Respondents on 2nd March 2018.

**(2)     Application to pierce the 'corporate veil' of Avenger and Straight**

45.     W seeks judgment directly against Avenger and Straight on the grounds that Avenger and Straight are mere 'ciphers' of H being used by him to evade this Court's Judgment and the 'corporate veil' should be pierced.  W seeks such relief in addition to her application against them under s.423 IA 1986 and s. 37 MCA 1973 (see further below).

46.     Mr Hagen QC puts forward two grounds to justify the entering of judgment directly against Avenger and Straight on the basis of the principles outlined in *Petrodel Resources Ltd v Prest* [2013] 2 AC 415. First, in respect of both Respondents, W submits that Avenger and Straight are mere 'nominees' for H, and hold their assets for him beneficially.  Second, in respect of Straight, W also submits that that, in cases of 'evasion', the court is entitled to pierce the 'corporate veil' and thereby hold Straight directly liable on the Judgment against H.

*'Nominee-ship'*

47.     Nominee-ship is a *"highly fact-specific issue"* (as Lord Sumption JSC said in *Prest*, at [52]).  The question is whether the assets of Avenger and Straight can be said to belong beneficially to H as the effective controller of those entities.  In my judgment, there is no difficulty in answering this question in the affirmative in both cases.  The Court has already made declarations that Cotor, Qubo 1 and Qubo 2 are all nominees for H and hold their assets absolutely for H.   The circumstances and timing of Avenger and Straight's creation are redolent of the same mischief.  In my view, it is clear that (just like Cotor, Qubo 1 and Qubo 2) Avenger and Straight are mere 'ciphers' designed by H to evade enforcement.

48.     I find and hold that H never intended to part with his beneficial ownership in the assets transferred to Avenger and Straight who continue to hold beneficially for H. The transfer of €260,000,000 from H's bank account to Avenger was part of a *faux* sale of M.V. "Luna" to Avenger by Tiffany after the divorce proceedings herein had been issued.  However, at the time, H was both the ultimate owner of Avenger, and the ultimate beneficial owner of Tiffany. There was no reality or validity to this transaction: it was merely a device whereby H (a) moved title to M.V. "Luna" into a Panama company and (b) divested himself of a very substantial sum of money under the cloak of an artificial sale arrangement. There is no difficulty in inferring, in all the circumstances, that H did not genuinely intend to part with beneficial ownership of either the cash or the vessel but intended to remain the real owner throughout.  This is a clear case of the beneficial owner simply trying to change the label on the tin.

49.     I further find and hold that, by reason of the fact that H provided all the purchase monies for no apparent consideration, there is a presumption of resulting trust which has not been rebutted (*c.f. Prest, passim*).

50.     Accordingly, a declaration is sought in respect of H's continuing ownership of the assets of Avenger and Straight.  W uses the language of 'nomineeship' so as to mirror the language used in the original Judgment, and because the concept of 'nomineeship' is more likely to be understood in, for example, civil law jurisdictions in which W may seek to have the Judgment recognised and enforced in due course.  However, various terms may be used to describe this arrangement including 'resulting trustee', 'bare trustee' or 'nominee'.

*Piercing the 'corporate veil'*

51.     The second ground invoked by W is that Straight is being used by H deliberately to evade or frustrate enforcement of the Judgment against him, such that the court should pierce the 'corporate veil' and hold Straight liable directly for the Judgment debt.

52.     The following propositions can be derived from the Supreme Court's judgment in *Prest*.

53.     First, historical terms such as 'facade' and 'sham' in fact refer to two separate and distinct principles: the 'concealment principle' and the 'evasion principle'.  In simple terms, the distinction between the concealment principle and the evasion principle can be likened to the distinction between 'lifting' and 'piercing' the 'corporate veil' (*per* Lord Neuberger of Abbotsbury PSC in *Prest*, at paragraph [60]).  As Lord Sumption JSC explained at paragraph [28]:

> *"The concealment principle is legally banal and does not involve piercing the corporate veil at all. It is that the interposition of a company or perhaps several companies so as to conceal the identity of the real actors will not deter the courts from identifying them, assuming that their identity is legally relevant. In these cases the court is not disregarding the "facade", but only looking behind it to discover the facts which the corporate structure is concealing. The evasion principle is different. It is that the court may disregard the corporate veil if there is a legal right against the person in control of it which exists independently of the company's involvement, and a company is interposed so that the separate legal personality of the company will defeat the right or frustrate its enforcement".*

54.     Second, the evasion principle applies where a person deliberately frustrates enforcement by interposing a company under his control, the court may pierce the 'corporate veil'.  As Lord Sumption JSC said at paragraph [35]:

> *"[T]there is a limited principle of English law which applies when a person is under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evades or whose enforcement he deliberately frustrates by interposing a company under his control. The court may then*

> *pierce the corporate veil for the purpose, and only for the purpose, of depriving the company or its controller of the advantage that they would otherwise have obtained by the company's separate legal personality.*"

55.   Third, the remedy of piercing the 'corporate veil' should, however, only be used where necessary to achieve justice. As Lord Sumption JSC said at paragraph [35]:

> "*[I]f it is not necessary to pierce the corporate veil, it is not appropriate to do so, because on that footing there is no public policy imperative which justifies that course*".

56.   Fourth, there is a distinction between merely acting 'improperly' in dealing with assets and acting with 'impropriety' in the sense of deliberately concealing or evading legal obligations. As again explained by Lord Sumption (at paragraph [36]):

> "*36.   In the present case, Moylan J held that he could not pierce the corporate veil under the general law without some relevant impropriety, and declined to find that there was any. In my view he was right about this. The husband has acted improperly in many ways. In the first place, he has misapplied the assets of his companies for his own benefit, but in doing that he was neither concealing nor evading any legal obligation owed to his wife. Nor, more generally, was he concealing or evading the law relating to the distribution of assets of a marriage upon its dissolution. It cannot follow that the court should disregard the legal personality of the companies with the same insouciance as he did. Secondly, the husband has made use of the opacity of the Petrodel Group's corporate structure to deny being its owner. But that, as the judge pointed out at para 219 "is simply [the] husband giving false evidence." It may engage what I have called the concealment principle, but that simply means that the court must ascertain the truth that he has concealed, as it has done. The problem in the present case is that the legal interest in the properties is vested in the companies and not in the husband. They were vested in the companies long before the marriage broke up. Whatever the husband's reasons for organising things in that way, there is no evidence that he was seeking to avoid any obligation which is relevant in these proceedings. The judge found that his purpose was "wealth protection and the avoidance of tax". It follows that the piercing of the corporate veil cannot be justified in this case by reference to any general principle of law.*"

57.   The facts of the present case can be usefully contrasted to those of in *Prest* set out above. I am satisfied that, in the present case, H is acting with real impropriety and deliberately seeking to evade his legal obligations to W by employing the devices of Avenger and Straight to put legal obstacles in the way of enforcement of the Judgment by her against him. Accordingly, in my judgment, the 'evasion' principle applies and it is appropriate to piece the 'corporate veil' in this case and I do so.

*Conflicts of law question*

58.     I turn to consider the conflicts of law question as to the applicable law to a case of piercing the 'corporate veil'. W submits that the appropriate law is the *lex fori*, *i.e.* English law.

59.     A choice of law question arises in cases which concern the piercing of the veil of a foreign incorporated company. As Lord Neuberger of Abbotsbury PSC explained in *VTB Capital plc v Nutritek International Corp* [2013] 2 AC 337, at [131]:

> "[T]hat question is whether the proper law governing the piercing of the corporate veil is the lex incorporationis, the lex fori, or some other law (for example, the lex contractus, where the issue concerns who is considered to be party to a contract entered into by the company in question). The ultimate conclusion may be that there is no room for a single choice of law rule to govern the issue... However, given that it has been common ground throughout these proceedings that the issue is to be resolved pursuant to English law, it is inappropriate to say more about this issue".

60.     In *Excalibur Ventures LLC v Texas Keystone Inc* [2013] EWHC 2767 (Comm), at paragraphs [1136] – [1145] Christopher Clarke LJ decided that the *lex incorporationis* should apply to the question whether the 'puppeteer' of a company should be held liable for that company's breach of contract. However, *Excalibur* would appear to involve the 'concealment principle' (*i.e.* the question whether the 'corporate veil' could be 'lifted') as opposed to the 'evasion principle' (*i.e.* the question whether the 'corporate veil' could be 'pierced'). It is noteworthy that *Prest* was not referred to in *Excalibur*.

61.     There would appear to be no authority determining the question of the proper law in relation to a claim based on the 'evasion' principle. In my judgment, a principled analysis to this question includes the following considerations. First, a consideration of the legal nature of the 'evasion' principle. In my view, the 'evasion' principle is clearly *remedial* in nature. It aims to prevent dishonest attempts to evade enforcement. The 'evasion' principle was developed to respond to dishonest attempts to evade enforcement of a subsisting obligation or liability by the stratagem of the interposition of a company or legal entity to thwart enforcement. Second, the well established general rule is that questions as to mode and method of enforcement and available remedies are for the *lex fori*: "*As a matter of English common law, the nature of the remedy is a matter of procedure to be determined by the lex fori*" (*Dicey, Morris & Collins on Conflict of Laws*, 15th Edn, 7-011). Third, there are sound reasons of common-sense and policy as to why the general *lex fori* rule should apply to cases concerning the 'evasion' principle. The Court should be astute not to aid evasion. To apply the *lex incorporationis* in relation to the 'evasion' principle would be to do the international fraudster's job for him: it would permit enforcement to be subverted simply by the use of corporate structures in jurisdictions with no such exceptions to the 'veil' of incorporation.

*Reasons for piercing Straight's 'corporate veil'*

62.   In summary, in my view, the following circumstances justify an order piercing the 'corporate veil' so as to make Straight directly liable on the Judgment against H.

63.   First, it is clear that, when M.V. "Luna" was transferred to Straight, both the legal owner (Qubo 2) and the true beneficial owner (H) were under an existing legal liability not to do so pursuant to the Judgment and violated their legal obligations by doing so.

64.   Second, it is clear from the evidence that Straight was incorporated deliberately to make enforcement of the Judgment against Qubo 2 (and H) more difficult by the interposition of a 'fresh' corporate entity, against which Judgment had not been entered.   Indeed, given the circumstances in which Straight was created and interposed, the only sensible inference is that the sole purpose of the incorporation of Straight and the transfer to it of M.V. "Luna" was to evade enforcement of the Judgment.   Straight's entire *raison d'etre* was evasion of the subsisting Judgment.

65.   Third, I am satisfied that the making of an order piercing the 'corporate veil' is clearly necessary in the interests of justice. This Court's Order and Judgment must be taken to the DIFC to be enforced.   It is not possible to determine at this stage whether the more conventional remedies W seeks against Straight will be recognised and given effect in the DIFC.   It is quite possible that the only order that the DIFC Courts  will recognise and enforce is an order of this Court based on a finding that H has used Straight in a dishonest fashion so as to evade enforcement of the Judgment.   There is, conversely, a possibility that if no such Order is made, W's efforts to enforce the Judgment in Dubai could fail altogether.

66.   For these reasons, in my judgment, the test for piercing the 'corporate veil' set out in *Prest* is clearly satisfied in the present case and the interests of justice require the making of such an order in this case.

*Submission of Avenger and Straight to the jurisdiction*

67.   I am satisfied, as presaged above, that Avenger and Straight can be said, parasitically, to have submitted to the Court's jurisdiction.   The reasoning is the same as that in the case of Qubo 1 and Qubo 2, namely H had fully and voluntarily submitted to the jurisdiction and participated in the proceedings until the month of the trial.   Avenger and Straight are mere 'ciphers' of H, being at the very least bare trustees for H.   An order against a trustee (*a fortiori* a bare trustee) binds the beneficiary and vice versa on grounds of privity (see *Gleeson v J Wippell & Co* [1977] 1 WLR 510 at pp. 514C & ff).   H's earlier submission to this court binds Avenger and Straight, even if they have purported not to submit.   I make appropriate declarations accordingly to this effect.

68.   It should be noted that W (rightly) does not presently seek an order piercing the 'corporate veil' in respect of Avenger because the other, more conventional relief sought against Avenger is likely to be sufficient to secure Third Party Debt Orders in the Isle of Man against it (although W reserves the right to apply in due course to do so should that become necessary).

### (3)     Transfer order under s. 24(1)(a) MCA 1973

69.     Part II of the MCA 1973 confers wide powers on the court to order ancillary relief in matrimonial proceedings. Section 23 provides for periodical and lump sum payments to a spouse or for the benefit of children of the marriage. Under section 24(1)(a), the court may order that:

> "*a party to the marriage shall transfer to the other party... such property as may be so specified, being property to which the first-mentioned party is entitled, either in possession or reversion*"

Section 25 provides for a number of matters to which the court must in particular have regard in making such orders, including:

> "*[the] income, earning capacity, property and other financial resources which each of the parties to the marriage has or is likely to have in the foreseeable future*"

70.     As Lady Hale explained in *Prest* (*supra*) at [84], when agreeing with Lord Sumption that the properties in question were held by the Respondent companies on trust for the husband:

> "*84  I agree that this appeal should succeed, on the basis that the properties in question were held by the respondent companies on trust for the husband. As he is beneficially entitled to them, they fall within the scope of the court's power to make transfer of property orders under section 24(1)(a) of the Matrimonial Causes Act 1973 . It also means that the court has power to order that the companies, as bare trustees, transfer these properties to the wife.*"

71.     I have held and declared that Straight holds M.V. "Luna" absolutely for H (see above).   It is, therefore, open to this Court to transfer M.V. "Luna" into W's name under s. 24(1)(a) MCA 1973 ("the Transfer Order") and order that all necessary steps be taken by H and Straight to vest M.V. "Luna" in W's name.   For the reasons outlined above, in my judgment, this is a paradigm case for such an order to be made and I so order.

72.     W undertakes that, to the extent that she is able to realise M.V. "Luna" following such transfer, she will give full credit for all proceeds of sale against the lump sum order made in her favour (*i.e.* £350 million before interest and costs).   I accept this undertaking.

### (4)     Section 423 Applications and s. 37 MCA 1973 applications

73.     The Court has already made orders under sections 423–425 of the IA 1986 setting aside and making payment orders in respect of (i) the transfer of H's interest in Avenger to the Bermuda discretionary trust and (ii) the purported transfer of the modern art collection and Cotor's cash to Qubo 1 and/or Qubo 2 (see paragraphs 92-107 of the Judgment).

74.     W now seeks further relief under sections 423–425 IA 1986 and/or section 37 MCA 1973 in respect of two other transactions: (i) the payment by H to Avenger of €260,000,000; and (ii) the transfer of M.V. "Luna" by Qubo 2 to Straight.

*Section 37 MCA 1973*

75.     The principles applicable in respect of section 37 MCA 1973 are out in the Judgment at paragraphs 96-97 and do not require repetition.

76.     The current application, in respect of the payment by H to Avenger of €260 million, is outside the relevant 3-year statutory period which creates the presumption that dispositions within this period fall to be set aside. However, I am satisfied that disposition should be set aside on the facts under section 37 for the same reasons as it is impugned under s. 423 IA 1986 (see further below).

77.     The relevant analysis is as follows. The statutory presumption under section 37 MCA 1973 does apply in respect of the disposition of M.V. "Luna" from Qubo 2 to Straight. This is because this disposition took place on 8th March 2017, *i.e.* within a year of the issuance of the present application. Section 37 requires the reviewable disposition to have been made by a party to the marriage. I found and held in paragraph 7 of my supplemental judgment dated 20th December 2016 that Qubo 2 was the 'cipher' or *alter ego* of H. Thus, the disposition of M.V. "Luna" to Straight, though purportedly by Qubo 2, was in fact made by H. Since this disposition was made within the last three years, there is a rebuttable presumption that it falls to be set aside. H has not appeared nor served any evidence rebutting this presumption. Accordingly, an order under section 37 MCA 1973 should be made. I declare for the same reasons that the disposition of M.V. "Luna" by Qubo 2 to Straight was void *ab initio* (*c.f.* Judgment, paragraph 97).

*Section 423 IA 1986*

78.     The general principles pursuant to which the court exercises its jurisdiction under section 423-425 IA 1986 are set out in my Judgment at paragraphs 102-107 and it is not necessary to rehearse them again here (see also Sales J in *4Eng Ltd v Harper* [2010] BCC 746, at paragraphs [9] – [16]). When determining whether a relevant purpose exists, it need not be established that the purpose was the sole or a dominant purpose; it is sufficient if the relevant purpose is a "*real substantial purpose*" of the transaction (see *IRC v Hashmi* [2002] 2 BCLC 489, [25], *per* Arden LJ). So long as a sufficient connection to the jurisdiction is shown so as to make it "*just and proper to make the order against [the transferee] despite the foreign element*", it is well established that s.423 may be given extra-territorial effect: see *Erste Group Bank AG, London Branch v JSC 'VMZ Red October'* [2015] 1 CLC 706, [116], and the cases cited therein. In my judgment, sufficient connection is established in this case by the fact that the transfers were deliberately effected to evade an English claim brought by the spouse of the transferor, who was resident in England.

*Application of principles*

79.     In my judgment, applying these principles to the facts of the present case, the requisite conditions for the exercise of the court's statutory jurisdiction are clearly fulfilled for the following reasons. First, I am satisfied that the relevant transactions were for nil

consideration: Avenger and Straight are both 'ciphers' for H with no independent commercial existence of their own. Despite his ongoing duty of full and frank disclosure (under *e.g. Jenkins v Livesey* [1985] AC 424), H has disclosed no assets of these entities which could have enabled them to give full consideration for a transfer by H to Avenger by H of €260,000,000, or by H to Straight of a vessel worth $487,278,000 (on 2017 insurance values). Second, I am satisfied that the real substantial purpose of the transactions was to place assets beyond the reach of W's claims, as part of what I have already referred to as the "*wider pattern of conduct by H designed to put his assets out of the reach of W*" (see Judgment, paragraph 100 and the findings at paragraphs 19 – 20 that H's conduct has been "*seriously iniquitous*" and that he has displayed a "*naked determination to hinder or prevent the enforcement of W's claim*"). Third, I am satisfied that neither transaction served any genuine commercial purpose. Both transactions were between entities that are known corporate 'ciphers' of H. It is clear that, in each case, H was on both sides of the transaction. Both transactions were undertaken in the shadow and wake of W's substantial ancillary relief claims against H. In the case of the Avenger transaction, this was done after it became clear that there was no prospect of the marriage being revived. In the case of the Straight transaction this was after there was a substantial money judgment against Qubo 2 and H. In summary, I am satisfied that these transactions form part of H's continuing deliberate and dishonest campaign to avoid his liabilities under the Judgment.

*Relief*

80.    I am satisfied that robust and immediate relief is required in this case for the following reasons. First, the transactions form part of H's continuing campaign to defeat W by concealing his assets in a web of offshore companies; and, as such, the court should fashion the fullest possible remedy to combat H's dishonest conduct (*c.f.* Sales J in *4Eng*). Second, the relief and remedy should be fashioned in light of the facts 'on the ground' and in a manner that gives the best prospects of protecting W's position as a creditor; and in practice, that means directing the orders against Avenger and Straight as the transferees. Third, the Court should seek to make practical orders that stand the best prospect of being recognised and enforced in the jurisdictions in which it is intended to seek enforcement: namely, Isle of Man and DIFC and Dubai.

81.    In these circumstances, I am satisfied that the same or similar considerations and orders are appropriate as the Court made in relation to Qubo 1 and Qubo 2, *i.e.* declaring the transactions void under s. 37 MCA 1973 and setting them aside under s.425(1)(a) and making orders pursuant to s.425(1)(d) "[requiring] *any person to pay to any other person in respect of benefits received from the debtor such sums as the court may direct*".

82.    Accordingly, in default of the above Transfer Order being satisfied within 7 days, I make the following orders:

        (1)    In respect of Avenger, an order that it pay W the sterling equivalent of €260,000,000; and

(2)   In respect of Straight, an order that Straight pay W the full value of the lump sum award against H up to the current value of the asset (namely, the current insurance value of M.V. "Luna" of  $487,278,000) on the basis that the value of the asset placed beyond W's reach is greater than the total value of her claim.

83.   To avoid any risk of double recovery, I order that Avenger and Straight's payment obligations are to be joint and several with those of the existing obligations under the Judgment. In this way, execution against Avenger or Straight would reduce *pro tanto* the Judgment debt, and *vice versa*.

84.   I am satisfied that these direct payment orders will be efficacious and assist enforcement of the Judgment by enabling W (i) to seek registration of a liquidated money judgment against Avenger in the Isle of Man; (ii) to seek Third Party Debt Orders in order to execute Judgment against Avenger's alleged rights against Carolina; and (iii) to seek enforcement of a liquidated money judgment against Straight in DIFC, which would improve the prospects of maintaining the DIFC freezing injunction and, ultimately, of executing the Judgment against M.V. "Luna".

**(5)      Extension of post-judgment freezing injunction to Avenger/Straight**

85.   W also seeks the extension of the post-judgment freezing injunction made in December 2016.

86.   I am satisfied that, both because of and notwithstanding H's history of hitherto disobedience of English Court Orders, it would be appropriate to extend the freezing injunction to cover also his 'ciphers', Avenger and Straight.  An extension may encourage and enable other Courts around the world with control of H's assets to assist this Court in enforcement as a matter of comity as the DIFC has done. Accordingly, I so order.

**CONCLUSION**

87.   In conclusion, for the above reasons, I grant W's application for relief and make the Orders set out in the Order signed by me on 21st March 2018.



# **EXHIBIT 6**



# INVOICE

**Invoice no.** 2014002137
**Client ref.** Luna
**Issue date** 30/12/14
**Issued at.** MONACO

**To:** Avenger Assets Corp.
50th and Aquilino De La Guardia Streets
Plaza Banco General
Panama
Panama
**Official no:** 737970
**Reg:** Certificate of Registry, Cayman Islands

**TVA VAT no.**

**Reference:** Luna - Monthly Management Fees - Jan 2015

| Description | Cost (USD) |
|---|---|
| Monthly Management Fees | 18,000.00 |
| **Total :** | **18,000.00** |

**Supply of services is outside the scope of VAT by virtue of European Union Directive 2008/8/CE**

**La prestation de service n'est pas soumise à TVA en vertu de la Directive 2008/8/CE du Conseil de l'Union Européenne.**

**Payable upon receipt to:**

| | |
|---|---|
| **Bank:** | |
| **Bank Address:** | 11 boulevard Albert 1er |
| **Account Name:** | YCO SAM |
| **IBAN:** | |
| **Swift Code:** | |

**EXHIBIT 7**

**Noya, Sandra**

| | |
|---|---|
| **From:** | Captain M/Y Luna <captain@my-luna.com> |
| **Sent:** | Monday, February 20, 2017 10:09 AM |
| **To:** | Russell Stockil | Y.CO |
| **Cc:** | !Luna; Michaela Svecova | Y.CO; !Technical |
| **Subject:** | RE: M/Y Luna - internal ISM/ISPS audits & technical inspection between 06th and 10th March 2017 |

Dear Russell,

Just to confirm our most recent conversation. Temur has requested the upcoming Audits and technical inspections postponed until "after 30th March"

It is likely Luna will still be in Miami until end of March (with the family onboard) but hopefully we can do the required Audits prior to us departing from here.
I will keep you updated on our movements and let you know if the situation changes.

Best regards,
Lui

**From:** Russell Stockil | Y.CO [mailto:rs@y.co]
**Sent:** 20 February 2017 09:37
**To:** Captain | M.Y. Luna <captain@my-luna.com>
**Cc:** !Luna <Luna@y.co>; Michaela Svecova | Y.CO <ms@y.co>; !Technical <technical@y.co>
**Subject:** RE: M/Y Luna - internal ISM/ISPS audits & technical inspection between 06th and 10th March 2017

Dear Lui,

We are in the process of firming up travel arrangements for this audit and technical inspection. The current plan as follows:

Michaela onboard Wednesday 8th March for ISM/ISPS internal audit
Patrick onboard Tuesday and Wednesday (7th/8th) for Technical Inspection

Patrick is planning to share costs as he has another vessel to visit in the area. Approx break down as follows:

Michaela – Flights €3 540.00, hotel €400, transport €100
Patrick  - Flights €1 770.00, hotel €600, transport €100

Making the approximate total €6 500.00

We will need to confirm flights today in order to get these rates and will need your approval to do so. Fares are refundable/changeable as per breakdown below.

Please advise if we can go ahead and firm up,

Best regards

Russell

1

YCO INC0004

```
FLIGHT     LX 563 - SWISS INTERNATIONAL AIR LINES        MON 06 MARCH 2017
--------------------------------------------------------------------------
DEPARTURE: NICE, FR (COTE D AZUR), TERMINAL 1 - AEROGARE 1     06 MAR 10:40
ARRIVAL:   ZURICH, CH (ZURICH AIRPORT)                         06 MAR 12:00
           FLIGHT BOOKING REF: LX/37XFFX
           RESERVATION CONFIRMED, BUSINESS (Z)             DURATION: 01:20
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
           BAGGAGE ALLOWANCE:      2PC
           MEAL:                   MEAL
NON STOP   NICE TO ZURICH
           EQUIPMENT:              AIRBUS INDUSTRIE A320-100/200


FLIGHT     LX 064 - SWISS INTERNATIONAL AIR LINES        MON 06 MARCH 2017
--------------------------------------------------------------------------
DEPARTURE: ZURICH, CH (ZURICH AIRPORT)                         06 MAR 13:15
ARRIVAL:   MIAMI, FL (MIAMI INTL)                              06 MAR 18:00
           FLIGHT BOOKING REF: LX/37XFFX
           RESERVATION CONFIRMED, BUSINESS (Z)             DURATION: 10:45
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
           BAGGAGE ALLOWANCE:      2PC
           MEAL:                   SNACK/MEAL
NON STOP   ZURICH TO MIAMI, FL
           EQUIPMENT:              AIRBUS INDUSTRIE A330-300



FLIGHT     LX 065 - SWISS INTERNATIONAL AIR LINES        THU 09 MARCH 2017
--------------------------------------------------------------------------
DEPARTURE: MIAMI, FL (MIAMI INTL)                              09 MAR 19:50
ARRIVAL:   ZURICH, CH (ZURICH AIRPORT)                         10 MAR 11:00
           FLIGHT BOOKING REF: LX/37XFFX
           RESERVATION CONFIRMED, BUSINESS (Z)             DURATION: 09:10
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
           MEAL:                   BREAKFAST/MEAL
NON STOP   MIAMI, FL TO ZURICH
           EQUIPMENT:              AIRBUS INDUSTRIE A330-300

FLIGHT     LX 568 - SWISS INTERNATIONAL AIR LINES        FRI 10 MARCH 2017
           OPERATED BY: SWISS GLOBAL AIR LINES
--------------------------------------------------------------------------
DEPARTURE: ZURICH, CH (ZURICH AIRPORT)                         10 MAR 12:50
ARRIVAL:   NICE, FR (COTE D AZUR), TERMINAL 1 - AEROGARE 1     10 MAR 14:05
           FLIGHT BOOKING REF: LX/37XFFX
           RESERVATION CONFIRMED, BUSINESS (Z)             DURATION: 01:15
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
           MEAL:                   MEAL
NON STOP   ZURICH TO NICE
           AIRCRAFT OWNER:         SWISS INTERNATIONAL AIR LINES, LX
           EQUIPMENT:              AVRO RJ100 AVROLINER


GENERAL INFORMATION
--------------------------------------------------------------------------
PUBLISHED FARE ON SWISS :EUR 3540
CHANGES PERMITTED WITH EUR250 PLUS ANY FARE DIFFERENCE
REFUNDABLE BEFORE DEPARTURE WITH EUR 250
```

**RUSSELL STOCKIL**
Director Yacht Compliance

YCO INC0005

m.  +33 625 005 825

Lui Anphin | Captain



MOB: +44 7990 002 842
GSM: +44 7721 239 988
VSat: +1 954 672 3810
VSat: +1 954 672 3811
FAX: +33 489 830 218

The information contained in this e-mail or in any attachments is confidential and is intended solely for the named addressee only. Access to this e-mail by anyone else is unauthorised. If you are not the intended recipient, please notify M.Y. Luna immediately by returning this email to sender. Do not read, use or disseminate the information. Opinions expressed in this e-mail are those of the sender and not necessarily the company. Although an active anti-virus policy is operated, the company accepts no liability for any damage caused by any virus transmitted by this email, including any attachments.

**From:** Patrick Renar | Y.CO
**Sent:** 20 February 2017 09:29
**To:** Captain M/Y Luna; Chief Engineer M/Y Luna
**Cc:** Chief Officer 1 M/Y Luna; !Luna; Michaela Svecova | Y.CO; !Technical; Julie Thibault | Y.CO; Aneta Sepiotek | Y.CO
**Subject:** RE: M/Y Luna - internal ISM/ISPS audits & technical inspection between 06th and 10th March 2017

Hi Lui,

Thanks for the heads up.

I wasn't anticipating any owner/guest to be on board during the Technical Inspection. Never done this before and not something I would recommend doing but speaking to Russel I understand that this situation could last for a long time. In this situation I will have to be guided by the vessel what we can do during the inspection. The list below should provide you with what we would like to do if possible. Whatever remains outstanding or not seen/tested will be recorded appropriately in the Technical Report.

Kind regards

**PATRICK RENAR**
Technical Manager

m.  +33 646 739 725

**From:** Captain | M.Y. Luna [mailto:captain@my-luna.com]
**Sent:** 19 February 2017 02:00
**To:** Patrick Renar | Y.CO <pmr@y.co>; Chief Engineer M/Y Luna <chiefengineer@my-luna.com>
**Cc:** Chief Officer 1 M/Y Luna <chiefofficer@my-luna.com>; !Luna <Luna@y.co>; Michaela Svecova | Y.CO <ms@y.co>; !Technical <technical@y.co>; Julie Thibault | Y.CO <jut@y.co>; Aneta Sepiotek | Y.CO <as@y.co>
**Subject:** RE: M/Y Luna - internal ISM/ISPS audits & technical inspection between 06th and 10th March 2017

Hi Patrick,

3

YCO INC0006

Just to give you the heads up on what to expect:

We have the family living onboard Luna since 17th December 2016. They do not normally accept any reason for disturbance or any accept inconveniency due to technical matters, inspections and the like. The principal is very sensitive to noise and Madam has just given birth to a baby daughter.

The principal likes his privacy and do normally not want to see any crew or unfamiliar faces around him.

Testing of equipment, black-out test, ship's emergency signals testing, crew drills etc. is possible with the principal's consent.

Crew are working in three shifts 24/7 to provide the expected service to the family – and we have done since 17th December. Our priority is to service the family so you might want to allow more time for your technical inspections.

Once I have received confirmation from the principal for your visit, I will confirm preferred location and dates for your attendance.
Anything we can prepare – please let us know.

Look forward to seeing you soon.

Best regards,
Lui

---

From: Patrick Renar | Y.CO [mailto:pmr@y.co]
Sent: 17 February 2017 08:26
To: Captain | M.Y. Luna <captain@my-luna.com>; Chief Engineer | M.Y. Luna <chiefengineer@my-luna.com>
Cc: Chief Officer | M.Y. Luna <chiefofficer@my-luna.com>; lLuna <Luna@y.co>; Michaela Svecova | Y.CO <ms@y.co>; lTechnical <technical@y.co>; Julie Thibault | Y.CO <jut@y.co>; Aneta Sepiotek | Y.CO <as@y.co>
Subject: RE: M/Y Luna - internal ISM/ISPS audits & technical inspection between 06th and 10th March 2017

Hi Lui, James

The plan at the moment is that I will be joining Michaela for the Technical Inspection. Our format of doing these inspections have changed and Aneta will contact the Chief Engineer and request some information from you.

Just to give you the heads up on what to expect:

- Ideally the yacht should be fully operational and be ready as you would for a Class and Flag Survey
- Pls try and limit the number of contractors on board to minimize the potential for disruptions. We only come on board one to two days a year and we really need the time to conduct a meaning full inspection

Inspection Items:
- Bridge, external decks and equipment
- All technical and machinery spaces, including tender garages etc
- Galley, pantry and laundry spaces
- Refrigeration and storage spaces
- Some crew areas
- Dead ship condition – testing of emergency lights, water tight doors, fire doors, fire dampers
- Testing of equipment such as: Generators, Emergency generator, OWS, rescue cranes, rescue boat
- Testing of systems such as bilge and fire system, main and emergency pumps, steering main and emergency
- Inspection of cranes and lifting appliances

4

YCO INC0007

- Inspection of water makers, AC system and refrigeration system
- Testing of Quick Closing Valves, fire alarms

Documentation, Certification:
- Type approval Certificates OWS, 15ppm, Sewage Treatment plant
- Oily record book, Bunker notes etc
- Critical equipment list
- Outstanding Defect Reports (if any)
- Lifting appliances and loose gear

We are planning an in-depth review of your Planned Maintenance System - :
- Component structure and completeness
- Maintenance task completeness
- History records and history recording
- Inventory records and spare parts

Kind regards

**PATRICK RENAR**
Technical Manager

m.  +33 646 739 725

**From:** Julie Thibault | Y.CO
**Sent:** 16 February 2017 10:51
**To:** Captain M/Y Luna <captain@my-luna.com>
**Cc:** Chief Officer 1 M/Y Luna <chiefofficer@my-luna.com>; Chief Engineer M/Y Luna <chiefengineer@my-luna.com>; !Luna <Luna@y.co>; Michaela Svecova | Y.CO <ms@y.co>; !Technical <technical@y.co>
**Subject:** M/Y Luna - internal ISM/ISPS audits & technical inspection between 06th and 10th March 2017

Dear Lui,

Further to discussion with Russell regarding the coming internal audit and technical inspection to be held between the 06th and 10th March 2017 (dates TBC) in Miami, please find attached:

- ISM audit checklist in preparation for this coming ISM audit
- ISPS audit checklist in preparation for this coming ISM audit
- Internal ISM audit report from last year – 10th March 2016
- Internal ISPS audit report from last year – 10th March 2016
- Technical inspection report from last year – 10th March 2016

Michaela, ric, will carry out the internal ISM/ISPS audit.

Regarding the technical inspection, our technical team will come back to you for the preparation of the inspection since the layout & reporting system of the inspection has changed. Person attending will also be advised in due time.

Should you have any question in the meantime, please let us know.

Kind regards,

5

YCO INC0008

Julie

**JULIE THIBAULT**
Co-Lead Operations

m.  +33 613 697 195

Lui Anphin | Captain



MOB: +44 7990 002 842
GSM: +44 7721 239 988
VSat: +1 954 672 3810
VSat: +1 954 672 3811
FAX:  +33 489 830 218

The information contained in this e-mail or in any attachments is confidential and is intended solely for the named addressee only. Access to this e-mail by anyone else is unauthorised. If you are not the intended recipient, please notify M.Y. Luna immediately by returning this email to sender. Do not read, use or disseminate the information. Opinions expressed in this e-mail are those of the sender and not necessarily the company. Although an active anti-virus policy is operated, the company accepts no liability for any damage caused by any virus transmitted by this email, including any attachments.

YCO INC0009

**EXHIBIT 8**

# Luna Crew IC Limited

P O Box 287, Fourth Floor, West Wing, Trafalgar Court, Admiral Park, St Peter Port, Guernsey, GY1 3RL
Telephone:  +44 (0) 1481 742240, Facsimile: +44 (0) 1481 740937

Luna
Avenger Assests Corp
c/o YCO SAM
9 Avenue President Kennedy J.F.K
Monaco
MC 98000

## INVOICE

### INV NO: LUE0005

Date: 22 January 2015

| | |
|---|---:|
| Salaries - January 2015 | € 266,928.75 |
| Crew Medical Expenses | € 4,853.20 |
| Crew Training and Certification | € 1,136.39 |
| Fixed monthly fee €120.00 | € 120.00 |
| Processing fee per payment – 52 @ €33.15 | € 1,723.80 |
| Bank charges per payment – 52 @ €39.00 | € 2,028.00 |
| Refund Bank charges re December 2014 salaries | -€ 375.14 |
| Echosign charges December 2014 - 20 @ £1 (€1.3) | € 26.00 |
| **EUR Total Amount Due:** | **€ 276,441.00** |

**Payable to:**   Account Number:

| | |
|---|---|
| Account Name: | Luna Crew IC Limited |
| Iban: | GB17RBOS16202956503622 |
| Bank: | Royal Bank of Scotland |
| | Guernsey Branch |
| Swift Code: | RBOSGGSP |
| Reference: | Please quote invoice number on your remittance |
| Terms: | Payment due on receipt of invoice. |

**EXHIBIT 9**



# Equasis - Ship folder
# LUNA
*imo: 1010222*

## • Disclaimers

Neither Equasis nor its officers or employees shall be under any liability or responsibility whatsoever regarding the data displayed on this site, including hyperlinks or printing. Whist Equasis will make every effort to provide accurate information, it does not rule out the possibility of inadvertent omissions or inaccuracies.

Neither Equasis nor its officers or employees accept any responsibility and shall not be liable for any loss to any person caused by or arising from any information displayed on this site.

Only factual information is displayed in Equasis. Information does not undergo any changes by Equasis. Special attention has been paid to the accuracy of the data. Data is regularly updated in order to help ensure that information remains as reliable as possible. The frequency of updates varies from provider to provider.

No part of the information contained in or from the Equasis website may be stored in a retrieval system, or transmitted in any form, or by any means without prior permission in writing from Equasis.

The following actions are forbidden:
  • Bulk-downloading of data contained on the site ;
  • Use of downloaded data for financial gain ;
  • Use of a robot or similar remote device to download large batches of data.

The above list is not exhaustive, and it should be noted that Equasis continually monitors the activity on its website and if misuse is detected, then the user's account can be locked without prior notice.

# Ship informations

## • Ship particulars

| Information | | Since |
|---|---|---|
| IMO number : | 1010222 | |
| Name of ship : | LUNA | (since 01/03/2010) |
| Call sign : | V7NV8 | |
| MMSI : | 538071095 | |
| Gross tonnage : | 5655 | (since 01/03/2010) |
| DWT : | 1290 | |
| Type of ship : | Houseboat | (since 01/03/2010) |
| Year of build : | 2010 | |
| Flag : | Marshall Islands | (since 01/08/2015) |
| Status of ship : | In Service/Commission | (since 09/10/2018) |
| Last update : | 08/01/2019 | |

## • Management detail

| IMO | Role | Name of company | Address | Date of effect |
|-----|------|-----------------|---------|----------------|
| 5982930 | Registered owner | STRAIGHT ESTABLISHMENT | Care of YCO SAM , L'ALBU, 17, avenue Albert II, 98000 Monaco-Ville, Monaco. | since 04/05/2017 |
| 5073856 | ISM Manager | YCO SAM | L'ALBU, 17, avenue Albert II, 98000 Monaco-Ville, Monaco. | since 29/12/2015 |
| 5073856 | Ship manager/ Commercial manager | YCO SAM | L'ALBU, 17, avenue Albert II, 98000 Monaco-Ville, Monaco. | during 10/2014 |

## • Classification status

| Classification society | Date change status | Status | Reason |
|------------------------|--------------------|--------|--------|
| Lloyd's Register (IACS) | since 31/03/2010 | Delivered | |
| Other | during 05/2006 | Not applicable | |

## • Classification surveys

| Classification society | Date survey | Date next survey |
|------------------------|-------------|------------------|
| Lloyd's Register (IACS) | 16/11/2014 | 15/11/2019 |

## • P&I information

| Name of P&I insurer | Recorded on |
|---------------------|-------------|
| The Ship owners' Mutual P&I Association (Luxembourg) | 28/03/2015 |

# Ship inspections

## • List of port state control

| PSC organisation | Authority | Port of inspection | Date of report | Detention | Duration (days) | Number of deficiencies |
|---|---|---|---|---|---|---|
| Paris MoU | Greece | Kérkira (Corfu) | 20/06/2014 | N | 0 | 1 |
| Paris MoU | Canada | Montreal | 16/06/2012 | N | 0 | 4 |
| Paris MoU | Spain | Barcelona | 14/04/2011 | N | 0 | |

# Ship history

## • Current and former name(s)

| Name of ship | Date of effect | Source |
|---|---|---|
| LUNA | since 01/03/2010 | IHS Maritime |

## • Current and former flag(s)

| Flag | Date of effect | Source |
|---|---|---|
| Marshall Islands | since 01/08/2015 | IHS Maritime |
| Cayman Islands | since 01/12/2014 | IHS Maritime |
| United Kingdom | since 01/05/2014 | IHS Maritime |
| Bermuda | since 01/03/2010 | IHS Maritime |
| Germany | since 01/03/2010 | IHS Maritime |
| Bermuda | since 01/11/2009 | IHS Maritime |

## • Current and former classification status

| Classification society | Date of survey | Sources |
|---|---|---|
| Lloyd's Register (IACS) | 16/11/2014 | Lloyd's Register |
| Lloyd's Register (IACS) | 31/03/2010 | Lloyd's Register |

## • Company

| Company | Role | Date of effect | Sources |
|---|---|---|---|
| STRAIGHT ESTABLISHMENT | Registered owner | since 04/05/2017 | |
| QUBO 2 ESTABLISHMENT | Registered owner | since 02/12/2016 | |
| STERN MANAGEMENT CORP | Registered owner | since 01/12/2016 | |

• **Company**

| Company | Role | Date of effect | Sources |
|---|---|---|---|
| YCO SAM | ISM Manager | since 29/12/2015 | |
| AVENGER ASSETS CORP | Registered owner | during 12/2014 | |
| YCO SAM | Ship manager/ Commercial manager | during 10/2014 | |
| WATKINS SUPERYACHTS LTD | ISM Manager | since 28/03/2014 | |
| TIFFANY LTD | Registered owner | since 28/03/2014 | |
| WATKINS SUPERYACHTS LTD | Ship manager/ Commercial manager | since 28/03/2014 | |
| BLUE OCEAN MANAGEMENT LTD | Ship manager/ Commercial manager | since 31/03/2010 | |
| NICOL INVESTMENTS LTD | Registered owner | since 31/03/2010 | |
| BLUE OCEAN MANAGEMENT LTD | ISM Manager | since 31/03/2010 | |



# Equasis - Ship folder
# DUMA
*imo: 8317605*

## • Disclaimers

Neither Equasis nor its officers or employees shall be under any liability or responsibility whatsoever regarding the data displayed on this site, including hyperlinks or printing. Whist Equasis will make every effort to provide accurate information, it does not rule out the possibility of inadvertent omissions or inaccuracies.

Neither Equasis nor its officers or employees accept any responsibility and shall not be liable for any loss to any person caused by or arising from any information displayed on this site.

Only factual information is displayed in Equasis. Information does not undergo any changes by Equasis. Special attention has been paid to the accuracy of the data. Data is regularly updated in order to help ensure that information remains as reliable as possible. The frequency of updates varies from provider to provider.

No part of the information contained in or from the Equasis website may be stored in a retrieval system, or transmitted in any form, or by any means without prior permission in writing from Equasis.

The following actions are forbidden:
- Bulk-downloading of data contained on the site ;
- Use of downloaded data for financial gain ;
- Use of a robot or similar remote device to download large batches of data.

The above list is not exhaustive, and it should be noted that Equasis continually monitors the activity on its website and if misuse is detected, then the user's account can be locked without prior notice.

# Ship informations

## • Ship particulars

| Information | | Since |
|---|---|---|
| IMO number : | 8317605 | |
| Name of ship : | DUMA | (since 01/11/1984) |
| Call sign : | A6E3096 | |
| MMSI : | 470937000 | |
| Gross tonnage : | 437 | (since 01/10/2005) |
| DWT : | 203 | |
| Type of ship : | Tug | (since 01/11/1984) |
| Year of build : | 1984 | |
| Flag : | United Arab Emirates | (since 01/05/2007) |
| Status of ship : | In Service/Commission | (since 21/11/1984) |
| Last update : | 23/11/2018 | |

• **Management detail**

| IMO | Role | Name of company | Address | Date of effect |
|---|---|---|---|---|
| 1064450 | Ship manager/ Commercial manager | MUBARAK MARINE LLC | Hamriya Port, PO Box 7220, Dubai, United Arab Emirates. | before 03/2015 |
| 5434653 | Registered owner | MIDDLE EAST MARINE DMCCO | Care of Mubarak Marine LLC , Hamriya Port, PO Box 7220, Dubai, United Arab Emirates. | during 12/2009 |
| 9991001 | ISM Manager | UNKNOWN | | since 01/11/1997 |

• **Classification status**

| Classification society | Date change status | Status | Reason |
|---|---|---|---|
| Lloyd's Register (IACS) | since 01/02/2006 | Reinstated | |
| Other | during 11/1984 | Not applicable | |

• **Classification surveys**

| Classification society | Date survey | Date next survey |
|---|---|---|
| Lloyd's Register (IACS) | 01/02/2016 | 31/01/2021 |
| Lloyd's Register (IACS) | 06/03/2014 | 05/03/2019 |
| Lloyd's Register (IACS) | 01/02/2014 | 01/02/2019 |

• **P&I information**

| Name of P&I insurer | Recorded on |
|---|---|
| The Ship owners' Mutual P&I Association (Luxembourg) | 20/02/2016 |

# Ship history

## • Current and former name(s)

| Name of ship | Date of effect | Source |
|---|---|---|
| DUMA | since 01/11/1984 | IHS Maritime |

## • Current and former flag(s)

| Flag | Date of effect | Source |
|---|---|---|
| United Arab Emirates | since 01/05/2007 | IHS Maritime |
| Comoros | since 01/01/2006 | IHS Maritime |

## • Current and former classification status

| Classification society | Date of survey | Sources |
|---|---|---|
| Lloyd's Register (IACS) | 01/02/2016 | Lloyd's Register |
| Lloyd's Register (IACS) | 06/03/2014 | Lloyd's Register |
| Lloyd's Register (IACS) | 01/02/2014 | Lloyd's Register |
| Lloyd's Register (IACS) | 30/08/2012 | Lloyd's Register |
| Lloyd's Register (IACS) | 01/02/2011 | Lloyd's Register |

## • Company

| Company | Role | Date of effect | Sources |
|---|---|---|---|
| MUBARAK MARINE LLC | Ship manager/ Commercial manager | before 03/2015 | |
| MIDDLE EAST MARINE DMCCO | Ship manager/ Commercial manager | during 12/2009 | |
| MIDDLE EAST MARINE DMCCO | Registered owner | during 12/2009 | |

• **Company**

| Company | Role | Date of effect | Sources |
|---|---|---|---|
| DUBAI SHIPBUILDING | Registered owner | since 10/01/2006 | |
| MUBARAK MARINE LLC | Ship manager/ Commercial manager | since 10/01/2006 | |
| DAMEN TRADING & CHARTERING | Ship manager/ Commercial manager | during 02/2004 | |
| DAMEN TRADING & CHARTERING | Registered owner | during 02/2004 | |
| UNKNOWN | ISM Manager | since 01/11/1997 | |

**<u>EXHIBIT 10</u>**

Freezing Order



**In the High Court of Justice**
**Family Division**                    No: FD13D05340

Before Mr Justice HADDON-CAVE sitting in open court at the Central Criminal Court of England and Wales, The Old Bailey, London EC4M 7EH

The Matrimonial Causes Act 1973

The Senior Courts Act 1981

THE MARRIAGE OF TATIANA MIKHAILOVNA AKHMEDOVA AND FARKHAD TEIMUR OGLY AKHMEDOV

AFTER HEARING Henry Clayton counsel for the Applicant on 12 January 2017 and Dakis Hagen QC and Andrew Holden counsel for the Applicant on 21 March 2018. None of the Respondents appeared and none of them were represented.

FREEZING ORDER MADE BY THE HONOURABLE MR JUSTICE HADDON-CAVE

TO  (1) FARKHAD TEMUR OGLY AKHMEDOV of 17 Mirza Shafi Street, Old City, Baku, Azerbaijan AZ1095; (2) WOODBLADE LIMITED of Patrician Chambers, 332 Agiou Andreou Street 3035, PO Box 545443, Limassol, Cyprus; (3) COTOR INVESTMENT SA of Credicorp Bank, 26th floor, Nicanor de Obarrio Avenue, 50th Street, Panama City, Republic of Panama; (4) QUBO 1 ESTABLISHMENT, c/o Walpart Trust, Zollstrasse 2, 9490 Vaduz, Liechtenstein (5) QUBO 2 ESTABLISHMENT c/o Walpart Trust, Zollstrasse 2, 9490 Vaduz, Liechtenstein.; (6) AVENGER ASSETS CORPORATION c/o Anzola Robles & Associate, Credicorp Bank Plaza, 26th floor, Nicanor De Obarrio Avenue, 50th Street, PO Box 0832-2325, Panama City; (7) STRAIGHT ESTABLISHMENT c/o Counselor Trust Reg., Zollstrasse 2, 9490 Vaduz, Liechtenstein.

WARNING: IF YOU FARKHAD TEMUR OGLY AKHMEDOV, WOODBLADE LIMITED, COTOR INVESTMENT SA, QUBO 1 ESTABLISHMENT, QUBO 2 ESTABLISHMENT, AVENGER ASSETS CORPORATION, STRAIGHT ESTABLISHMENT, DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS FARKHAD TEMUR OGLY AKHMEDOV,

Page 1 of 11

Freezing Order

> **WOODBLADE LIMITED, COTOR INVESTMENT SA, QUBO 1 ESTABLISHMENT QUBO 2 ESTABLISHMENT, AVENGER ASSETS CORPORATION AND/OR STRAIGHT ESTABLISHMENT_TO BREACH THE TERMS OF THIS ORDER MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED**

**The Parties**

1. The Applicant is Tatiana Mikhailovna Akhmedova.
   The First Respondent is Farkhad Temur Ogly Akhmedov.
   The Second Respondent is Woodblade Limited.
   The Third Respondent is Cotor Investment SA.
   The Fourth Respondent is Qubo 1 Establishment.
   The Fifth Respondent is Qubo 2 Establishment.
   The Sixth Respondent is Straight Establishment
   The Seventh Respondent is Avenger Assets Establishment

2. Unless otherwise stated, a reference in this order to 'the Respondent' means all of the Respondents.

3. This order is effective against any Respondent on whom it is served or who is given notice of it.

**Definitions and interpretation**

4. A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

5. A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

**Recitals**

6. This freezing order is a further continuation of a freezing injunction made on notice against the Respondents Farkhad Teimur Ogly Akhmedov, Woodblade Limited, Cotor Investment SA, Qubo 1 Establishment and Qubo 2 Establishment on 20 December 2016 12 January 2017 by Mr Justice Haddon-Cave and an extension of that order on notice against the Sixth Respondent Straight Establishment and the Seventh Respondent Avenger Assets Corporate each on the application of the Applicant Tatiana Mikhailovna Akhmedova.

7. The original freezing order dated 20 December 2016 was made at the conclusion of a final hearing after the handing down of judgment on 15 December 2016 [2016] EWHC 3234 (Fam) on the Applicant's claim for financial orders consequent upon the

**Freezing Order**

divorce between the Applicant and the Respondent. The Respondent had participated in the proceedings but he did not (in breach of court orders) appear personally, nor was he represented, at the final hearing.

8. Despite having notice of this hearing and his right to attend, neither of the Sixth and Seventh Respondents, nor any other individual served with the freezing order, have has attended this hearing.

9. The original freezing order was made in aid of the enforcement of the final order dated 20 December 2016 granting financial orders for lump sum, property transfer and costs in the Applicant's favour.

10. At the time of making this order the Respondent has not complied with any of the financial orders for lump sum, property transfer and costs. Accordingly, the Applicant seeks the continuation of the original freezing order until further order or payment of security for the sum due.

11. The Respondent has the right to apply to the court to vary or discharge the order – see **"The right to seek variation or discharge of this order"** below.

**Undertakings given to the court by the Applicant Tatiana Mikhailovna Akhmedova**

12. Anyone notified of this order shall be given a copy of it by the Applicant's legal representatives.

13. The Applicant shall pay the reasonable costs of anyone other than the Respondent which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondent's assets and if the court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant shall comply with any order the court may make.

14. If this order ceases to have effect (for example, if the Respondent complies with his obligations under the final order dated 20 December 2016 granting financial orders for lump sum, property transfer and costs) the Applicant shall immediately take all reasonable steps to inform in writing anyone to whom he has given notice of this order, or who he has reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

Freezing Order

## IT IS ORDERED THAT:

15. Until further order of the court, the Respondent must not in any way remove, dispose of, deal with, charge or diminish the value of the following assets (whether they are in or outside England and Wales) namely:

    a.  11 pictures painted by the following artists and entitled:

| No. | Artist | Painting Description |
|---|---|---|
| 1. | Klein, Yves | Untitled Blue Monochrome (IKB 271), 1960, mixed media, 50 by 50cm |
| 2. | Doig, Peter | Country-rock (wing-mirror), 1999, oil on canvas, 194.9 by 270cm |
| 3. | Warhol, Andy | Nine Multi-coloured Marilyns (Reversal Series), 1979-86, acrylic and silkscreen ink on canvas, 138 by 106.1 cm |
| 4. | Wesselmann, Tom | Bedroom Painting #49, 1983, oil on canvas, 66 by 40 5/8 in |
| 5. | Warhol, Andy | Brigitte Bardot, 1974, Acrylic and silkscreen ink on canvas, 120.6 x 120 cm |
| 6. | Klein, Yves | Untitled Anthropométrie (ANT 9), 1960, mixed media, 76 by 54 cm |
| 7. | Rothko, Mark | Untitled, 1968, acrylic on paper laid on panel, 85 by 65.6 cm |
| 8. | Rothko, Mark | Untitled (Yellow and Blue), 1954, (registered under the Mark Rothko Estate number 1218.68), oil on canvas, 242.9 x 186.7 cm |
| 9. | Klein, Yves | Accord Bleu (RE 52), 1958, Dry pigment, synthetic resin, natural sponges, 20 ½ x 53 ¾ x 3 in |
| 10. | Hirst, Damien | Kingdom of Heaven, 2006, butterflies and household glass on canvas, 243.8 by 213.4cm |
| 11. | Gursky, Andreas | Pyongyang V, 2007, c-print mounted on Plexiglas in artist's frame, ed. 1/6, framed: 307 by 219cm, image: 284.5 by 196.5cm |

Full descriptions and photographs of the pictures are provided in Annex 1 to this order.

    b.  the Respondent's UBS accounts in the Zurich branch:
        i.

**Freezing Order**

ix.

c.  the assets in portfolio number 240-139817-R001 held with UBS Switzerland AG and/or UBS AG under Banking Relationship 240-139817;

d.  the Respondent's and Third Respondent's accounts at UBS AG or UBS Switzerland AG;

e.  the Respondent's ALFA Bank accounts (Moscow branch), including those with numbers:

f.  the Respondent's International Bank of Azerbaijan accounts including account with       number

g.  the Third Respondent's accounts at LGT Bank, in Herrengasse 12, FL-9490 Vaduz, Liechtenstein;

h.  the Fourth Respondent's accounts in LGT Bank, in Herrengasse 12, FL-9490 Vaduz, Liechtenstein;

i.  the Fifth Respondent's accounts in LGT Bank, in Herrengasse 12, FL-9490 Vaduz, Liechtenstein;

**Freezing Order**

    j.  the shareholding in Avenger Asset Corp; incorporated in Panama on 25 February 2014, under no 827218;

    k.  the shareholding in Carolina Ltd, incorporated in the Isle of Man on 24 March 2014, Company No. 010923V;

    l.  the shareholding in Lucy Ltd, incorporated in the Isle of Man on 24 March 2014, Company No. 010924V;

    m. the shareholding in Tiffany Ltd, incorporated in the Isle of Man on 8 July 2013, Company No. 009858V;

    n.  the Aston Martin Virage Vantage Coupe motor car registration mark W7 FTA;

    o.  the sporting guns understood to be stored at Holland & Holland or in the possession of Richard Roberts (at the Hollies, Old Avenue, West Byfleet KT14 6AE),including the following:

        i.   12 bore Holland & Holland shot gun (side by side) no. 40034;
        ii.  12 bore Holland & Holland shot gun (side by side) no. 40033;
        iii. 20 bore Holland & Holland shot gun (side by side) no. 41361;
        iv. 20 bore Holland & Holland shot gun (side by side) no. 41360;
        v.  12 bore Holland & Holland shot gun (side by side) no.41398.

16. Until further order of the court, the Sixth Respondent must not in any way dispose of, deal with or diminish the value of any of its assets, whether by sale, charge or otherwise, and whether they are in or outside of the jurisdiction, up to the sum of $487,278,000. This prohibition includes in particular the vessel named "LUNA" with IMO No. IMO-1010222, which is currently registered with the Office of the Maritime Administrator of the Republic of the Marshall Islands with Certificate of Registry No. 5817-PY in the name of the Seventh Respondent ("the Vessel").

17. Until further order of the court, the Seventh Respondent must not in any way dispose of, deal with or diminish the value of any of its assets whether they are in or outside of the jurisdiction, up to the sum of €260,000,000.

18. If the total value free of charges or other securities ('unencumbered value') of the Respondent's assets restrained by paragraph 15 - 17 exceeds, in the case of each of the First to Fifth Respondents, £441,678,836, in the case of the Sixth Respondent, $487,278,000, or in the case of the Seventh Respondent, €260,000,000, the Respondent may dispose of or deal with those assets so long as the total unencumbered value of all his assets restrained by paragraph 15 - 17 whether in or outside England and Wales remains above  in the case of each of the First to Fifth

**Freezing Order**

Respondents, £441,678,836, in the case of the Sixth Respondent, $487,278,000, and in the case of the Seventh Respondent, €260,000,000 (provided that, for the avoidance of doubt, in no circumstances may the Respondent deal with the art work at Annex 1 or with the Vessel as defined at paragraph 17 above).

19. This order applies to assets (whether or not specifically listed) which are in the Respondent's own name and whether they are solely or jointly owned. For the purpose of this order the Respondent's assets include any asset which he has the power, directly or indirectly, to dispose of or deal with as if it were his own. The Respondent is to be regarded as having such power if a third party holds or controls the asset in accordance with his direct or indirect instructions.

20. Permission to the Applicant to enforce this order in any country outside England and Wales, or to seek an order of a similar nature including orders conferring a charge or other security against the Respondent or the Respondent's assets.

**Provision of Information**

21. Unless the following paragraph applies, the Respondent shall within 7 days of service of this order and to the best of his ability inform the Applicant's solicitors of all his assets worldwide whether in his own name or not and whether solely or jointly owned, giving the value, location and details of all such assets.

22. If the provision of any of this information is likely to incriminate the Respondent, he may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of court and may render the Respondent liable to be imprisoned, fined or have his assets seized.

23. Within 14 days of being served with this order, the Respondent shall make and serve on the Applicant's solicitors an affidavit setting out the above information.

**Provision of security**

24. The order will cease to have effect if the Respondent –
    (a)   provides security by paying the sum of £441,678,836 into court, to be held to the order of the court; or
    (b)   makes provision for security in that sum by another method agreed with the Applicant's legal representatives.

**Costs**

25. The Respondents shall (on the basis of joint and several liability) pay by 4pm on 26 January 2017 the Applicant's costs in relation to the freezing order application, summarily assessed at £15,140.20 including VAT.

**Service on the Respondent**

**Freezing Order**

26. This order shall be served on the First Respondent:

    a.  by WhatsApp on +994 50 211 64 53

    b.  by courier at his office address at 9 Solyanka Street, Moscow, Russia

    c.  by registered post c/o the First Respondent's son, Temur Akhmedov,  at 100 Knightsbridge, Apartment C 7.1, London SW1X 7LJ

    d.  by email to the email address of the First Respondent's secretary, asr79@bk.ru.

27. This order shall be served on the Fifth Respondent:

    a.  by registered post c/o Walpart Trust Reg, Zollstrasse 2, 9490 Vaduz, Liechtenstein

    b.  by email to mail@walpart.net.

    c.  by email to mail@walchschurti.net.

28. This order shall be served on the Sixth Respondent:

    a.  by registered post to c/o Counselor Trust Reg, Zollstrasse 2, 9490 Vaduz, Liechtenstein

    b.  by email to mail@walpart.net.

    c.  by email to mail@walchschurti.net.

29. This order shall be served on the Seventh Respondent:

    a.  by registered post c/o Anzola Robles & Asociados, Credicorp Bank Plaza, 26th Floor, Nicanor De Obarrio Avenue, 50th Street, PO Box 0832 2325, Panama City, Republic of Panama

    b.  by email to info@anzolaw.net.

**The right to seek variation or discharge of this order**

30. Anyone served with or notified of this order may apply to the court at any time to vary or discharge this order (or so much of it as affects that person), but they must first inform the Applicant's solicitors. If any evidence is to be relied upon in support

**Freezing Order**

of the application, the substance of it must be communicated in writing to the Applicant's solicitors in advance.

**Parties other than the Applicant and Respondent**

31. *Effect of this order*

It is a contempt of court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

32. *Set off by banks*

This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to the Respondent before it was notified of this order.

33. *Withdrawals by the Respondent*

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondent if the withdrawal appears to be permitted by this order.

34. Permission for service: The Applicant or her legal advisers may at their discretion serve this order by fax or email on any of the following persons (where reference is made to a company that shall include all of its subsidiaries):

    a. Temur Akhmedov;

    b. Any auction house (including but not limited to Sotheby's, Christies, Bonhams, Phillips and De Pury);

    c. Any bonded warehouse (including but not limited to Stabiq Treasure House, Wirtschaftspark 27, 9492, Eschen, Liechtenstein) or storage facility or fine art dealer storing all or any of the 11 pictures set out in paragraph 15a above;

    d. Anthony D Kerman;

    e. Richard Roberts;

    f. Anna Adamova;

    g. Holland & Holland;

    h. UBS AG (London branch) and its UK subsidiaries;

    i. UBS (Monaco) S.A. ;

    j. UBS Switzerland AG;

    k. UBS AG (Swiss branch);

    l. ALFA Bank;

    m. International Bank of Azerbaijan;

    n. LGT Bank;

    o. Wolfgang Canal;

    p. Walch & Schurti Attorneys at Law Ltd

    q. Walpart Trust;

    r. Anzola Robles & Asociados;

    s. Avenger Assets Corp (Panama);

**Freezing Order**

t.   Stuart Frize;
u.   Lui Anphin;
v.   Anzola Robles & Asociados;
w.   Carolina Limited (Isle of Man);
x.   Lucy Limited (Isle of Man);
y.   Tiffany Limited (Isle of Man);
z.   Equiom (Isle of Man) Limited;
aa.  Sunningdale Limited (Cyprus);
bb.  Sedell Finance Ltd (BVI);
cc.  Patrikios Pavlou & Associates LLC (Cyprus);
dd.  Hogan Lovells;
ee.  Geneva airport (entity designated for storing artwork);
ff.  The port authority of the Port of Dubai
gg.  The coast guard of the United Arab Emirates
hh.  The Office of the Maritime Administrator of the Republic of the Marshall Islands
ii.  Such further persons as appear to hold assets on behalf of the Respondent or any entity controlled by him.

## Persons outside England and Wales

35. Except as provided in the following paragraph, the terms of this order do not affect or concern anyone outside the jurisdiction of this court.

36. The terms of this order will affect the following persons in a country or state outside the jurisdiction of this court –
    (a)   the Respondent or his officer or agent appointed by power of attorney;
    (b)   any person who –
          (i)    is subject to the jurisdiction of this court;
          (ii)   has been given written notice of this order at his residence or place of business within the jurisdiction of this court; and
          (iii)  is able to prevent acts or omissions outside the jurisdiction of this court which constitute or assist in a breach of the terms of this order; and
    (c)   any other person, only to the extent that this order is declared enforceable by or is enforced by a court in that country or state.

## Assets located outside England and Wales

37. Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with –
    (a)   what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

**Freezing Order**

    (b)    any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicant's solicitors.

**Dated 21 March 2018**

---

**Notice pursuant to PD 33A para 1.4**

You Tatiana Mikhailovna Akhmedova, the Applicant, may be sent to prison for contempt of court if you break the promises that have been given to the court

**Statement pursuant to PD 33A para 1.5**

I understand the undertakings that I have given, and that if I break any of my promises to the court I may be sent to prison for contempt of court
*Signed*
.........
Tatiana Mikhailovna Akhmedova

Date .................................

---

**Communications with the court**
All communications to the court about this order should be sent to –
The Clerk of the Rules, Queen's Building, Royal Courts of Justice, Strand, London WC2A 2LL quoting the case number. The telephone number is 020 7947 6543.
The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

**Name and address of Applicant's legal representatives**
The Applicant's legal representatives are –

Withers LLP, 16 Old Bailey, London EC4M 7EG
(Ref. Peter Wood)

Tel: 020 7597 6000 Fax

peter.wood@withersworldwide.com

lesley.timms@withersworldwide.com

**EXHIBIT 11**

Case 1:19-mc-00026-JPO   Document 3-1   Filed 01/16/19   Page 88 of 90
Case 4:18-mc-03504   Document 3   Filed in TXSD on 12/14/18   Page 1 of 3
Case 4:18-mc-03504   Document 1-11   Filed in TXSD on 12/11/18   Page 1 of 3

United States District Court
Southern District of Texas

**ENTERED**

December 14, 2018

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE APPLICATION OF
TATIANA AKHMEDOVA,

                Applicant,

REQUEST FOR DISCOVERY PURSUANT
TO 28 U.S.C. § 1782.

                                  CASE No.

## ORDER GRANTING TATIANA AKHMEDOVA'S
## APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

      This matter comes before the Court by an application for discovery pursuant to 28 U.S.C. § 1782 (the "**Application**") filed by Tatiana Akhmedova ("**Applicant**"). Having reviewed the Application and Applicant's supporting memorandum of law, the declaration of James H. Power, dated December 11, 2018, as well as the exhibits thereto, the Court is satisfied that the production of documentation is warranted pursuant to 28 U.S.C. § 1782, and the Court hereby ORDERS as follows:

1) The Application is GRANTED.

2) Applicant is authorized to issue and serve subpoenas on Lloyd's Register North America, Inc. and Lloyd's Register Quality Assurance, Inc. ("**Lloyd's Register**"), for the production of the following documents:

    a) All documents in the possession and control of Lloyd's Register concerning arrangements to move the Vessel within or outside of Port Rashid, Dubai since its arrest in February

Case 1:19-mc-00026-JPO   Document 3-1   Filed 01/16/19   Page 89 of 90
Case 4:18-mc-03504   Document 3   Filed in TXSD on 12/14/18   Page 2 of 3
Case 4:18-mc-03504   Document 1-11   Filed in TXSD on 12/11/18   Page 2 of 3

2018, including but not limited to any communications between Lloyd's Register and any of its affiliates Farkhad or his agents, Straight Establishment or its agents, the master of the Vessel or any third parties;

b) All documents in the possession and control of Lloyd's Register concerning efforts being undertaken to maintain the Vessel while it is under arrest in Dubai since February 2018, including but not limited to any communications between Y. CO. and Farkhad or his agents, Straight Establishment or its agents, the master of the Vessel or any third parties;

c) All documents in the possession of Lloyd's Register regarding the Vessel's port visit to South Florida in 2016 and 2017 including but not limited to emails with the Vessel and her crew, invoices regarding services performed including surveyors or inspections for the Vessel during its stay in South Florida, documents and correspondence from the Vessel's representative to Lloyd's Register regarding the transfer of ownership of the Vessel from Avenger Assets to Stern Management Corp., from Stern Management Corp. to Qubo 2 Establishment, from Qubo 2 Establishment to Straight Establishment;

d) All documents in the possession of Lloyd's Register concerning arrangements to move the Vessel within or outside of Port Rashid, Dubai since its arrest in February 2018, including but not limited to any communications between Lloyd's Register and any of its worldwide subsidiaries or affiliates and Farkhad or his agents, Straight Establishment or its agents, the master of the Vessel or any third parties .

e) All documents in the possession or control of Lloyd's Register concerning any request for a tow certificate and any request to review and/or approve a tow plan for the Vessel including any correspondence between Lloyd's Register and the Vessel insurance company beginning January 1, 2016 to present.

2

Case 1:19-mc-00026-JPO   Document 3-1   Filed 01/16/19   Page 90 of 90
Case 4:18-mc-03504   Document 3   Filed in TXSD on 12/14/18   Page 3 of 3
Case 4:18-mc-03504   Document 1-11   Filed in TXSD on 12/11/18   Page 3 of 3

f)   All class and statutory surveys, certificates for the Vessel, machinery, or equipment, records, correspondence between Lloyd's Register and the vessel's representative, invoices for services performed for the LUNA from January 1, 2016 to present.

3)   Lloyd's Register shall produce the documents requested in their respective subpoenas on an expedited basis, within seven (7) days of service of the subpoena.

4)   Lloyd's Register shall preserve documents and evidence, electronic or otherwise, in their possession, custody or control that contain information potentially relevant to the subject matter of the Applicant's document request.

5)   Notice of the discovery authorized by this Order need not be provided to any of the individuals named as a party in the foreign proceedings until such time as emergency relief is sought in the foreign proceedings based on the information obtained pursuant to this Order.

6)   Lloyd's Register shall maintain the confidentiality of the fact and content of the Applicant's discovery efforts, except as necessary to seek advice of counsel, who are to be similarly restrained.

7)   The Court shall retain jurisdiction over the matter for the purpose of enforcement and assessing any supplemental request for discovery assistance that may be requested by Applicant.

8)   A copy of this Order shall be served with each discovery demand.


SO ORDERED

Dated: Houston, Texas
       December 14, 2018

UNITED STATES MAGISTRATE JUDGE

3