1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE TATIANA AKHMEDOVA,

4                   Applicant,              19 mc 26 (JPO)

5   ------------------------------x
                                            New York, N.Y.
6                                           September 10, 2020
                                            2:45 p.m.
7
    Before:
8
                        HON. J. PAUL OETKEN,
9
                                            District Judge
10
                            APPEARANCES
11
    HOLLAND & KNIGHT LLP
12      Attorneys for Applicant
    BY:  JAMES H. POWER
13       MARIE LARSEN

14  SIMON HARTER
        Attorney for Miscellaneous Y.CO NY Inc.
15

16

17

18

19

20

21

22

23

24

25

1          (Case called)

2          THE DEPUTY CLERK:  Starting with counsel for

3    Ms. Akhmedova, please state your name for the record.

4          MS. LARSEN:  Good afternoon, your Honor.  This is

5    Marie Larsen from Holland & Knight on behalf of Tatiana

6    Akhmedova.

7          MR. POWER:  And this is James Power of Holland & Night

8    on behalf of Tatiana Akhmedova.

9          MR. HARTER:  Good afternoon, your Honor.  This is

10   Simon Harter, and I represent a nonparty who has been

11   subpoenaed, Y.CO NY.

12          THE COURT:  Good afternoon, everyone.

13          Is there anyone else who wanted to identify

14   themselves?  If you're just nonparties, you don't need to.

15          Is there anyone else who wants to?

16          Okay.  I scheduled this call, and I'm sorry about the

17   delay.  The parties have a joint issue regarding a motion to

18   compel Y.CO NY to respond to a subpoena.  And this is seeking

19   discovery in aid of overseas litigation.

20          The nonparty, Y.CO NY, has opposed the motion to

21   compel filed by the applicant and seeks to quash the subpoena.

22   The parties spent a lot of time kind of screaming at each other

23   and saying a lot of sort of unhelpful stuff.

24          What I really want to know -- and I guess I'll let

25   Ms. Larsen or Mr. Power address this -- is why in God's name

1    are you wasting the time of a federal court if everything

2    sought in this subpoena is within the ambit of a subpoena

3    that's being vigorously litigated in state court across the

4    street?

5              MS. LARSEN:  Yes, your Honor.  This is Marie Larsen

6    speaking.  Just to clarify, you're correct that a separate

7    subpoena has been served in the New York state action.

8              That subpoena I would not say is being vigorously

9    litigated.  We have obtained a judgment in the New York action.

10   Although we contend that Y.CO's response to that subpoena is

11   also deficient, we --

12             THE COURT:  Is there anything sought here that's not

13   sought there?

14             MS. LARSEN:  No, your Honor.

15             THE COURT:  Is there a standard, a legal standard, for

16   what's producible here that's different from there?

17             MS. LARSEN:  Well, there is a specific issue which has

18   to do with the confidentiality agreement.  So the documents

19   which are being produced in the New York action have been

20   limited to being used solely in that action.

21             So currently, we are not allowed to use any documents

22   obtained in that action for the purposes of the foreign

23   litigation, which, as you know, is the entire purpose of this

24   1782 action.

25             THE COURT:  Can't you request relief from that, from

```
 1    the judge there?  That's to enforce the foreign judgment, isn't

 2    it?

 3          MS. LARSEN:  Well, there is separate foreign

 4    litigation ongoing that is adjudicative and involves adding new

 5    parties in the English proceedings and so on.  So the issues

 6    are slightly different in the two litigations, even though they

 7    arise out of a similar set of facts.

 8          THE COURT:  So that is seeking to enforce a particular

 9    judgment.

10          What judgment is that?  I'm talking about the state

11    court case.

12          MS. LARSEN:  Yes.  So that is a judgment in our

13    client's favor.  There are two English judgments which amount

14    to approximately $500 million.  So the New York action is to

15    recognize the English judgment in New York.  That's currently

16    on appeal to the First Department.

17          The documents requested in this action have to do with

18    ongoing litigation in England arising out of that judgment.

19    But there is additional adjudication about adding defendants

20    and clawing back fraudulent transfers, and so forth.

21          THE COURT:  I'm sorry.  That's going on in New York

22    state court?

23          MS. LARSEN:  No.  That's going on in the English

24    proceedings.

25          THE COURT:  You said the state court action is on
```

 1  appeal to the First Department.

 2          Is it stayed in the trial court, or is it still going?

 3          MS. LARSEN:  No.  It's not stayed.

 4          THE COURT:  Why do you say it's not being vigorously

 5  litigated yet.

 6          MS. LARSEN:  There is no stay in the trial court, but

 7  there is certainly not ongoing litigation happening at the

 8  moment.  We have received recognition of the foreign judgment,

 9  and that has just completed briefing in the First Department.

10          THE COURT:  What's going on in the trial court?

11          MS. LARSEN:  At the moment, nothing.  There was some

12  briefing related to an attachment of funds, but that was

13  recently resolved.

14          THE COURT:  Okay.  How do you justify coming to

15  federal court seeking a subset of what you're seeking in the

16  state court?

17          MS. LARSEN:  Well, the documents that were requested

18  here were completely unrelated to the New York action which was

19  pending at the time that this action was filed.  So these

20  documents are being used for the purposes of litigation which

21  is ongoing in England.

22          We are certainly entitled to post-judgment discovery

23  in New York, but the scope of requests are slightly different

24  in that action.  In that action, 14 document requests were

25  made.  And in this action, only one document request was made,

1    a simpler document request, which is for Y.CO NY's file as to

2    the vessel, NY Luna, which is an asset of the judgment debtor.

3            THE COURT:  Describe in common sense terms what

4    documents you're seeking to compel.

5            MS. LARSEN:  So we expect that there is a file at Y.CO

6    New York and its affiliates -- it has various Monaco and

7    London-based affiliates -- which maintain correspondence with

8    the owner; correspondence that Y.CO has on behalf of the owner

9    with vendors for the vessel, for example, the flag state.

10           Y.CO manages the registration of the vessel in the

11   Marshall Islands.  Correspondence with other third parties

12   related to the vessel.  There are management agreements with

13   the various owners that have been in charge of the vessel over

14   the past six years, so internal documents related to powers of

15   attorney that have been issued; internal documents related to

16   payments that are made.

17           Y.CO NY for about five years maintained a bank account

18   in the United States for the purposes of making payments on

19   behalf of the vessel and on behalf of the owner in connection

20   with the vessel.

21           So there is an entire file of documents related to

22   this vessel that the applicant is interested in for the

23   purposes of showing that various entities that it's litigating

24   against in England have been involved in secreting assets in

25   connection with the estoppel.

1          THE COURT:  In seeking them in the state court, what's

2    the status of that category of documents?

3          MS. LARSEN:  So in the state court, that specific

4    document request, which was also included in the state court,

5    Y.CO has objected to that request.  We also believe that that

6    production has been deficient.  We planned to file a motion to

7    compel there as well, but the court was closed for many weeks

8    because of the pandemic.

9          Certainly the small batch of documents that have been

10   produced are not sufficient to constitute the entire file that

11   we've requested here.  So for that reason, we reject the

12   argument that somehow these requests are duplicative of each

13   other.  And even if they were, the documents were not produced

14   in the other action in any event.

15         THE COURT:  Why are they not duplicative?

16         MS. LARSEN:  Well, in this action, we've only made one

17   request.  Even though it was contained in the other subpoena,

18   it was not answered in the New York subpoena.  So we have not

19   received the documents responsive to this request to date.

20         THE COURT:  But I thought you made some separate point

21   about how it's not duplicative.

22         MS. LARSEN:  Well, in Y.CO's papers, they've argued

23   that the subpoena requests are the same.  I'm merely pointing

24   out that, yes.  While this request was contained there, it was

25   not -- the subpoenas are not exactly the same.  I'm just trying

1    to clarify that point.

2              In any event, in response to the fact that it was

3    listed in the other subpoena, we did not receive those

4    documents in any event from Y.CO.

5              THE COURT:  Okay.  Understood.

6              Mr. Harter.

7              MR. HARTER:  Thank you, your Honor.  I apologize.

8    There's a lot to respond to.  But before I get into

9    Ms. Larsen's comments, I would just like to say one thing if I

10   may.

11             Your Honor, this is a global battle.  And by "global,"

12   I mean that there are litigations in numerous different

13   countries.  This battle is being carried out between two

14   unspeakably wealthy people.

15             Caught in the middle here and in the New York state

16   court action is Y.CO NY, which has two people associated with

17   it.  Its only presence in New York is that it has bank

18   accounts, different bank accounts, containing only clients'

19   funds.  There is not a single person associated with Y.CO NY

20   who goes to an office.  They have no presence.

21             This is now, however, the third subpoena that has

22   issued out of Holland & Knight.  The first one was issued to a

23   separate Y.CO company in Florida, then they issued the subpoena

24   in New York state court, and now we're here.

25             Ms. Larsen just gave an explanation, some specific

1    reasons about what they expected to have received.  She

2    mentioned management agreements.  I gave them all the

3    management agreements.  She mentioned other things about other

4    kinds of files.

5          Your Honor, this is the first I'm getting any specific

6    explanation from the plaintiff as to why Y.CO NY's response to

7    the state court subpoena was deficient, other than a vague

8    statement that your production is deficient.

9          To say that the two subpoena requests -- there is one

10   question in the subpoena in this court.  To say not only that

11   they're not duplicative, but Ms. Larsen said they're unrelated.

12         Your Honor, they're identical.  They seek identically

13   the same documents, and never once have we heard an explanation

14   of -- we've heard expectations.  They're expecting to get this

15   filed that they expect exists.

16         Why didn't they tell me that when I produced 1,500

17   pages of documents in the New York state court case?

18         THE COURT:  You're also counsel in the state court

19   case?

20         MR. HARTER:  Yes.  I absolutely am.  When myself and

21   Mr. Power first discussed -- when we first discussed Y.CO at

22   all, it was in December.  At that point in time, I had already

23   been retained to act for Y.CO NY in the state court case.  But

24   very shortly thereafter when Holland & Knight asked if I was

25   going to be retained in this case, I asked the client.  And the

 1    client said yes.

 2           The other way in which the plaintiff has tried to

 3    distinguish the two cases is they say, well, there's a

 4    confidentiality order in the state court case.  So we can't use

 5    those documents in the action in London.

 6           Your Honor, that was a negotiated and stipulated

 7    confidentiality order.  It wasn't something that we went into

 8    court unilaterally and sought.  The reason why we requested

 9    that the plaintiff agree to a confidentiality order, which the

10    plaintiff did agree to, was because, as we showed them in the

11    management contracts we produced, there is a contractual

12    confidentiality obligation on my client.

13           That obligation applies identically in the New York

14    state action and in this action to my client.  And yet, when we

15    were negotiating the confidentiality stipulation, there was not

16    one word mentioned that they were going to take this shocking

17    position in this case that there was a difference.

18           Now, your Honor asked if they had sought relief in the

19    other court from that confidentiality stipulation.  Your Honor

20    also asked what's the status of my client's subpoena response

21    in the state court action.

22           And the answer is that the plaintiff has done nothing

23    in the state court action since we finished responding to that

24    subpoena in June.  So in any event, when it comes to the

25    confidentiality stipulation in the New York state action,

KGGJHOLD1

1    counsel for plaintiff wrote me a letter and said, hey, in the

2    London case, we've added some new defendants.  And we'd like

3    you to agree to lift confidentiality on, and they attached a

4    list of the documents that Y.CO NY had already produced.

5            I wrote back to Holland & Knight.  And I said, look.

6    Here are my concerns.  As I've explained, there's a

7    confidentiality -- and I invited discussion, your Honor.

8    Instead of taking me up on that invitation, Holland & Knight

9    told this Court that Y.CO NY refused to do so.

10           As I indicated in my submissions, your Honor, if they

11   have a problem with our response to the New York state court

12   subpoena that we completed in June, then they should take that

13   up in the New York state case which is now, as they've already

14   indicated, fully re-engaged with this case.

15           The New York state court judge has dealt with a TRO, a

16   motion for recognition of the first English judgment, questions

17   over an attachment order, and the motion for contempt that the

18   plaintiff brought against my client which was denied.  That

19   judge in the state court action knows a great deal about this

20   case.

21           Now, one last point.  It is correct that the plaintiff

22   has added some new defendants in the English action.  But the

23   plaintiff took the first English judgment to the New York state

24   court action and got recognition of that judgment.

25           To hear the plaintiff speak now, it's as though they

1   can't do that if they get another judgment against the

2   additional defendants.  Of course they can.

3          So why would they go take one judgment from the same

4   court in the UK to state court and a different judgment to this

5   Court to enforce?

6          When it comes to discovery for use in foreign

7   proceedings, we've only heard about this English proceeding.

8   We do know that the yacht itself, which is what the plaintiff

9   is trying to get legal ownership to because the divorce

10  judgment is for half a billion dollars.  And very conveniently,

11  the yacht is worth about the same.

12         This is the second largest expeditionary yacht in the

13  world.  What I mean by "expeditionary" I mean it's a yacht that

14  actually sails rather than sits in a harbor looking pretty.

15         THE COURT:  Has anyone been on the yacht?

16         MR. HARTER:  I haven't been on it, your Honor.  But

17  it's got its own Wikipedia page.

18         THE COURT:  I know.  I looked it up.  I think we

19  should do a tour of the yacht.

20         Mr. Power, Ms. Larsen, have you guys been on the

21  yacht?

22         MS. LARSEN:  No.

23         MR. POWER:  Your Honor, I have not been on the yacht.

24  But I can tell you that I would much appreciate an order from

25  you saying that you are ordering myself and Mr. Harter to go

1    and the yacht and gather these very same documents that we're

2    asking for.  I would love to have that order, your Honor.

3              THE COURT:  Go ahead, Mr. Harter.

4              MR. HARTER:  Thank you, your Honor.

5              I was starting to talk about the yacht being in Dubai.

6    The plaintiffs took the same English judgment I believe or

7    other English judgments to Dubai to get them recognized in

8    Dubai so that they could get the yacht.

9              Well, on August 20, just a couple weeks ago, the

10   highest court in Dubai rejected that application and declared

11   the issue res judicata, which I'm telling you about.

12             Again, Y.CO is a company that has less than 100

13   people.  It's had to lay off 10 percent of its workforce since

14   COVID struck.  One of the people it had to lay off, Mr. Russell

15   Stockhill, was the primary client contact for this vessel.

16             We're just getting whipsawed.  My client doesn't have

17   anybody paying their bill.  They're having to pay this for all

18   of these inconsistent actions by the plaintiff -- first in the

19   Southern District of Florida, then in New York state court, and

20   now in your Honor's court.

21             THE COURT:  Isn't Y.CO the company that manages the

22   yacht?  A sort of U.S. side of yacht operations?  Isn't that

23   what it is?

24             MR. HARTER:  No, your Honor.  Y.CO manages yachts.

25   The Luna is managed out of their office in Monaco.  The office

 1    in Fort Lauderdale manages U.S.-based yachts.

 2          Now, when I say "manage," they arrange crewing, they

 3    deal with operations of the yacht, legal compliance, safety

 4    issues, registration issues, annual mechanical inspections,

 5    technical issues when they arise, changes that have to be done

 6    when the yacht is refitted, and all of the financial aspects of

 7    getting a yacht to move from one place to another.

 8          So there are five people that work full time just on

 9    this yacht.  It's Y.CO's largest yacht, which is no surprise,

10    considering it's the second largest yacht that actually leaves

11    port, practically speaking, in the world.

12          THE COURT:  As of now, the yacht is owned and

13    possessed by Mr. Akhmedova?

14          MR. HARTER:  I don't know about the ownership, your

15    Honor.  I defer to Holland & Knight because I don't know where

16    that ownership issue stands.

17          All I do know is that a couple of weeks ago, the court

18    in Dubai, the highest court in Dubai, refused to recognize the

19    English judgment in the plaintiff's favor, which would have

20    allowed her then to enforce her half-billion-dollar judgment by

21    taking the yacht itself.

22          THE COURT:  Do you have anything to add on that,

23    Ms. Larsen?

24          MS. LARSEN:  Yes.  I certainly do.  The fact is

25    Mr. Harter is correct that this is a worldwide litigation in

1    many jurisdictions.  Our client has the largest divorce

2    judgment in England.

3           To claim that Y.CO is being dragged into this by our

4    client ignores the fact that they manage a yacht which, yes.

5    It's involved in a large litigation.

6           Our client's ex-husband is using a web of entities to

7    hide his billion dollars' worth of assets from our client.  And

8    the largest of those assets is this yacht.  There is also a

9    litigation going on in the Marshall Islands, which is the flag

10   state of the yacht, where Ms. Akhmedova does have this

11   favorable judgment.

12          Recognizing the English judgment, the flag state has

13   the authority to turn over ownership of the yacht to her once

14   that judgment is confirmed by the Supreme Court of the Marshall

15   Islands.  So, yes.  There is a lot of litigation.

16          But to claim that all of the discovery related to

17   these various actions must all take place in the New York state

18   court action is just not the case.

19          Yes.  Ms. Akhmedova is adding defendants in England

20   because Mr. Akhmedova is using a web of entities and using his

21   son to help him own this yacht, manage the yacht, make payments

22   related to the yacht, and to transfer funds to avoid her

23   judgment.

24          So Y.CO is in possession of documents related to the

25   addition of defendants which is an active litigation.  The

1   suggestion that we should go to New York where we have

2   recognized a money judgment under the New York Convention is

3   completely unrelated to an ongoing litigation where we have

4   asked for discovery assistance related to that litigation.

5          Eventually when we get a separate money judgment in

6   England against the new defendants, maybe at that time we would

7   bring that to New York to recognize.  But this is in the

8   prejudgement stage with respect to prejudgement for this

9   additional litigation.

10         THE COURT:  So who are you talking about?  The new

11  parties you're talking about in England.

12         MS. LARSEN:  So the new parties include

13  Ms. Akhmedova's son, Timur, who assists his father managing the

14  yacht.  And it includes Lichtenstein trust and trustees which

15  are actively involved in moving these assets around between

16  various trusts that are hard for her to reach.

17         THE COURT:  This is all about enforcing this big

18  judgment, and that doesn't take it out of 1782.  But that makes

19  it essentially parallel to the state court procedure you're

20  using which is enforcing a foreign judgment, registering and

21  enforcing a foreign judgment.

22         I wonder why this isn't a question of abstention,

23  Colorado River abstention as opposed to the other types of

24  abstention where there are parallel state court proceedings.

25         To the extent there are legal issues involving hiding

 1    assets, fraudulent conveyances, whatever, those all could be

 2    encompassed within a state court action to enforce a foreign

 3    judgment.

 4          I don't know why I wouldn't abstain insofar as there

 5    is a state court that's looking at this.  It just seems so

 6    wasteful to have me -- I have 400 civil cases and a bunch of

 7    criminal cases, and everything is behind because we haven't

 8    been doing jury trials since March.

 9          It just seems so wasteful, not to mention the issues

10    of comity for me to step in to grant the relief you request

11    when there is a state court action covering the entirety of the

12    subpoena here.

13          MR. POWER:  Your Honor, this is James Power.

14          THE COURT:  Yes.

15          MR. POWER:  I don't want to interrupt my colleague.

16    My name was thrown in the mix, and I do have probably some

17    additional information.

18          So, one, I do think it's certainly an

19    oversimplification or an overstatement to suggest that the

20    New York state action is parallel or duplicative of what is

21    going on in the foreign proceedings.  It is only a small part

22    of it.  It is not in any way duplicative.

23          I want to make one more other point as to, again,

24    how -- I had suggested to move forward and what is creating

25    this sort of Gordian knot here, so to speak, is the documents

1  produced in New York -- remember.  I believe we got the 1782

2  order before we got a judgment in New York.

3          So the order in 1782 I believe predates even the

4  New York judgment.  So insofar as there is a timeline here, we

5  always knew we needed these documents for use in foreign

6  proceedings.

7          It just so happens that a judgment was entered fairly

8  quickly in New York.  We did serve a subpoena for the purposes

9  of judgment enforcement.  Obviously it was time sensitive.

10          And I believe Y.CO, again, whose number one client is

11  Mr. Akhmedova and who will do anything on his behalf,

12  including, again, it seems to me won't do anything against his

13  interests.  In this particular case, delay is in

14  Mr. Akhmedova's interest.

15          So when the documents were produced in accordance with

16  the New York subpoena, they were produced -- in other words,

17  they were, I would say, withheld unless I agreed to an

18  incredibly restrictive protective agreement saying they can

19  only be used in New York.

20          While I agreed to that, Mr. Harter and I of course

21  knew that the 1782 subpoenas were still outstanding.  Under no

22  circumstance and under no basis would I ever agree to say, give

23  me documents in a New York proceeding.

24          I basically was having a gun held to my head saying,

25  if you want these documents, you better agree to a protective

1    agreement.  And that protective agreement then later precludes

2    me from ever using documents obtained in the 1782 in the very

3    foreign proceedings that we are pursuing.

4            So in essence, it was a bargain that we agreed to to

5    get documents quickly, which we did use successfully in the

6    New York action showing that the funds of Mr. Akhmedova were

7    being held in the Y.CO accounts.

8            Y.CO held $25 million of Mr. Akhmedova's money in

9    New York in the Southern District, despite Mr. Akhmedova saying

10   he didn't have any property in New York.  By the very documents

11   that were given by Y.CO, we proved that case in New York.

12           Now, the problem that happened is when we went to

13   seize those funds, Y.CO, Mr. Foster, the very person who we're

14   seeking documents from in the 1782 action, woke up at 4:00 in

15   the morning after a TRO was served and wire transferred I

16   believe it was $2 million from the Y.CO NY account on behalf of

17   Farkhad to Farkhad Lichtenstein account.

18           MR. HARTER:  Your Honor --

19           MR. POWER:  Let me just finish.

20           May I finish just for a moment?

21           THE COURT:  Go ahead.  Finish.

22           MR. HARTER:  No, Mr. Power.

23           MR. POWER:  Mr. Harter may have a different

24   interpretation of why he woke at 4:00 in the morning.  But

25   regardless, that's the state court action.  I think we're

1    drifting down the road with the state court action that again I

2    think is irrelevant.

3         I have suggested I think a reasonable start for the

4    1782 -- I understand this Court has a large docket, and we

5    don't want to clog it up.  But the New York state court has it

6    even -- I would say the delays in New York state are extreme to

7    put it mildly.

8         So to suggest that we would have to wait a year and a

9    half to try to litigate on this protective agreement for

10   documents to be used in a foreign proceeding when we have a

11   validly filed and we think legally sufficient 1782 application,

12   even if it's to get similar documents -- obviously we would

13   welcome the production of those same documents in New York as a

14   start but, of course, not subject to the protective agreement.

15        Now we could have a reasonable conversation, myself

16   and Mr. Harter, with this Court what would be the terms of a

17   protective agreement in this case using the same documents.

18        It cannot be the protective agreement that we signed

19   in New York saying which says he documents can only be used in

20   New York, because, to me, it wouldn't make sense that one party

21   could use a state court action to deny the same party the right

22   to get documents in another action to use in a foreign

23   proceeding by way of a stipulation.  That stipulation doesn't

24   say, by the way, that we don't get to pursue our rights under

25   the 1782.

1          Unless Mr. Harter believes that that was something

2     implicit in that agreement, I certainly would say it was not.

3     In fact, I would suggest that I would never get authority from

4     a client to be able to agree to such restrictive terms.

5          THE COURT:  Let me ask Mr. Harter if you'd like to

6     respond, including addressing the point about why, given the

7     purpose of a 1782, the applicant here should be restricted to

8     not being able to use the documents outside of New York.

9          MR. HARTER:  Certainly, your Honor.  If I may just

10    very briefly, I pointed out in my surreply that counsel for the

11    plaintiff had made a false representation to this Court in

12    stating that there was a pending motion for contempt on the

13    very matter Mr. Power was just discussing, a TRO.

14         At the time that they submitted that to your Honor

15    under the strictures of Rule 11, they knew that that motion had

16    already been denied.  Mr. Power has just told you a number of

17    things that are factually incorrect.  But I'll just get to the

18    bottom line.

19         They sent the email to Y.CO in Monaco but not to

20    Mr. Foster who he's talking about.  They sent it to a general

21    mailbox.  It was the middle of the night as he said.

22    Mr. Foster didn't get up at 4:00 a.m.

23         Not only that, but their inability to send the email

24    to the correct person is surprising when one considers that

25    Holland & Knight represent Y.CO, Inc. in Florida and it's only

1   because their retainer letter unbelievably constitutes a waiver

2   of a conflict in cases like this.

3          But most of all, your Honor, they weren't even

4   authorized by the Court in the order granting the TRO to serve

5   via email.  So that has been just a very unfortunate

6   digression.

7          The issue that your Honor asked about about the

8   different purposes of the two actions, I certainly understand

9   that point.  However, what seems to be getting lost in the

10  comments being made by counsel for the plaintiff is that we

11  provided them with years' worth of management contracts for

12  this vessel.  And every one of them has a confidentiality

13  clause in it.  That's why I asked for the confidentiality

14  stipulation.

15         Mr. Power makes it sound like it was extortion.  If he

16  wasn't happy with it, he could have gone to court.  They still

17  have yet to file any sort of motion to compel.  They have still

18  yet to file any motion seeking relief.  They haven't even

19  responded to my invitation to discuss the point.

20         So to my client, yes.  The two actions are different.

21  But my client is still under the same contractual

22  confidentiality obligation.  It's got the same exposure in both

23  cases.

24         Now that's not to say that my client isn't willing

25  to -- look.  I've been saying to Mr. Power all along we know --

1   Y.CO NY knows -- I put this in writing to him -- that we are

2   legally bound to respond to subpoenas.

3          At the same time, I've said, but at the same time Y.CO

4   NY is under this contractual confidentiality agreement.  And we

5   put the wording of that agreement in front of him.  He and I

6   had several back-and-forth emails.  And we ended up agreeing to

7   a stipulation.  We even made a change after we were at the

8   final draft that Mr. Power requested.

9          So the issue for my client is the same, and that is

10  that we have a confidentiality obligation that unless we do

11  what we need to do in a legal action, we run the risk of

12  getting sued.

13         None of this deals with the fact that the single

14  question in the subpoena in this court is identical to one that

15  we've already answered.  It's absolutely identical.

16         What use the plaintiff wants to put our responses

17  to -- that's one issue.  But it's the identical question.  It's

18  90 percent already in the New York state court in front of a

19  judge that's had to deal with so much of this case already, the

20  merits of this case.

21         The last thing.  I'm sorry.  If I understood

22  correctly, before Mr. Power started speaking, Ms. Larsen said

23  that the plaintiff has obtained a judgment in the Marshall

24  Islands, which is the country in which the yacht is actually

25  legally registered, that is in the plaintiff's favor,

```
 1   recognizing the English judgment, and that the Marshall Islands
 2   has the power to change the ownership documents over to her and
 3   the only thing holding them back is it's on appeal.
 4          If that's true, why is Y.CO NY being put through all
 5   of this when once that appeal is addressed, if it's in the
 6   plaintiff's favor, all of this is over, at least insofar as
 7   what they want from Y.CO is concerned, because then she'll have
 8   ownership of the yacht, which is exactly what Ms. Larsen said
 9   is the goal here.
10          THE COURT:  Okay.  I've heard enough.  I'm going to
11   deny the motion to compel and grant the motion to quash filed
12   by Y.CO without prejudice to renewal after six months if things
13   in the state court turn out to be illusory in terms of the
14   relief that is duplicative.
15          The reason for it is because I find the Colorado River
16   abstention or analogous doctrines that would apply I conclude
17   in the 1782 context make it inappropriate to pursue this matter
18   which is a subset of what's being litigated in the state court.
19   And alternatively, in a situation where this is being litigated
20   in the state court, discovery here would not be proportional to
21   the needs of the case.  That's my ruling.
22          Anything further?
23          MR. HARTER:  No.  Thank you, your Honor.  Thank you
24   for the opportunity to speak.
25          THE COURT:  Anything further from Holland & Knight?
```

1          MS. LARSEN:  No, your Honor.

2          THE COURT:  Thanks, everybody.  We're adjourned.

3          MR. POWER:  Thank you.

4          THE COURT:  Bye-bye.

5          (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25